IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| WERNER HOLDING CO. (DE), INC., *et al.*, | : | Case No. 06- _10578_  (____) |
| | : | |
| Debtors. | : | Joint Administration Pending |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DECLARATION OF LARRY V. FRIEND, VICE PRESIDENT, CHIEF FINANCIAL OFFICER, AND TREASURER OF WERNER HOLDING CO. (DE), INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

COMMONWEALTH OF PENNSYLVANIA )
                                                        )  ss:
COUNTY OF MERCER                        )

LARRY V. FRIEND, of full age, being duly sworn, deposes and says:

1.       I am the Vice President, Chief Financial Officer, and Treasurer of Werner

Holding Co. (DE), Inc., a Delaware corporation. I have held this position since April 5, 1999. In

my capacity as Vice President, Chief Financial Officer, and Treasurer, I am familiar with the

day-to-day business operations, financial condition, and the books and records of the debtors and

debtors in possession in the above-captioned cases (collectively, the "Debtors" or the

"Company").[1]

2.       Each of the Debtors has filed a voluntary petition for relief under chapter

11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors intend to

---

[1]    The last four digits of the taxpayer identification numbers for each of the Debtors follow in parentheses: (i)
Werner Holding Co. (DE), Inc. (1345); (ii) Werner Holding Co. (PA), Inc. (6895); (iii) Werner Co. (4435); and
(iv) WIP Technologies, Inc. (2599). Werner Holding Co. (DE), Inc. and WIP Technologies, Inc. are located at
1105 North Market Street, Suite 1300, Wilmington, Delaware 19801. Werner Holding Co. (PA), Inc. and
Werner Co. are located at 93 Werner Road, Greenville, Pennsylvania 16125.

continue in the possession of their respective properties and the management of their respective

businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      I submit this declaration (the "Declaration") on the Debtors' behalf in

conjunction with their petitions and in support of the various motions and applications for orders

filed with the Court contemporaneously herewith (collectively, the "First Day Pleadings").

A copy of the resolutions of the Boards of Directors authorizing the filing of each of the Debtors'

petitions is annexed to each Debtor's respective petition. Except as otherwise indicated, all facts

as set forth in this Declaration are based upon my personal knowledge, my review of relevant

documents, my discussions with other members of the Debtors' management team, or my

opinion based upon experience, expertise, and knowledge of the Debtors' operations and

financial condition. If I were called upon to testify, I could and would testify competently as to

the veracity of the facts set forth herein.[2]

4.      Section I of this Declaration describes the Debtors' businesses and the

circumstances surrounding the commencement of the chapter 11 cases. Section II sets forth the

relevant facts in support of the Debtors' various First Day Pleadings.

## THE DEBTORS' BUSINESSES

A.      General Background

5.      Werner Co., the principal operating Debtor, is a wholly owned subsidiary

of Werner Holding Co. (DE), Inc. ("Werner DE"), a Delaware corporation, which, in turn, is a

wholly owned subsidiary of a Pennsylvania corporation, Werner Holding Co. (PA), Inc.

("Werner PA"). Neither Werner PA nor Werner DE has substantial operations, nor do they own

---

[2]  Capitalized terms not defined herein shall have the meanings ascribed to such terms in the relevant First Day
Pleading.

assets other than their investments in Werner DE and Werner Co., respectively. WIP

Technologies, Inc., a wholly owned subsidiary of Werner Co., holds the intellectual property for

the Company.

      6.    The Company is the nation's largest manufacturer and marketer of ladders

and other climbing products, producing five principal categories of climbing equipment: (i)

single and twin stepladders; (ii) extension, fixed, and multipurpose ladders; (iii) attic ladders; (iv)

stages, planks, work platforms, and scaffolds; and (v) assorted climbing product accessories.

The majority of the Company's climbing product sales are of either aluminum or fiberglass

ladders.

      7.    The Company's sales and marketing network is directed by an

experienced in-house sales team of national and regional sales managers. The Company's

climbing products are sold directly to customers and through approximately forty-five

independent, commissioned manufacturer's representative organizations, which sell to four

major distribution channels: (i) home improvement; (ii) hardware; (iii) professional; and (iv)

other retail. The Company's sales organization is further supported by field merchandisers who

assist non-retail customers with product merchandising, point-of-purchase signage, and sales

techniques.

      8.    The Company currently maintains its principal executive offices in

Greenville, Pennsylvania. As of the Petition Date, the Debtors employed approximately 1,189

salaried and hourly employees. The Company operates manufacturing facilities in: (i) Chicago,

Illinois; (ii) Merced, California; and (iii) Juarez, Mexico. In addition, the Company maintains

numerous distribution facilities throughout the United States.

- 3 -

9.    For the year ending December 31, 2005, the Company reported audited net sales, on a consolidated basis, of $472,354,000. As of March 31, 2006, the Company's unaudited balance sheet reflected total assets, on a consolidated basis, of $201,042,000 and total liabilities of $473,447,000.

B.    Capital and Debt Structure

    (a)    First Lien Credit Facility

10.    On June 11, 2003, Werner DE entered into a Credit Agreement providing an aggregate credit facility of $230.0 million (as amended, supplemented or otherwise modified, the "First Lien Credit Facility"). The First Lien Credit Facility was initially comprised of a "First Lien Term Loan" of $180.0 million and a "First Lien Revolving Credit Facility" of $50.0 million. The available borrowings under the First Lien Revolving Credit Facility are reduced by the aggregate face amount of letters of credit issued and outstanding pursuant to a $35.0 million letter of credit sub-facility (the "LC Sub-Facility"). As of March 31, 2006, the total amount of letters of credit issued and outstanding under the LC Sub-Facility was $27.98 million. JPMorgan Chase Bank, N.A. serves as the administrative agent under the First Lien Credit Facility (the "Senior Pre-Petition Agent").

11.    The First Lien Credit Facility is secured by substantially all of the assets of Werner DE and its subsidiaries (specifically, Werner PA has pledged its stock interest in Werner DE to the First Lien Lenders (as defined below)), and is guaranteed by each of Werner DE's subsidiaries (except for Werner Funding Corporation) and Werner PA.

12.    Effective as of May 10, 2005, the First Lien Credit Facility was amended in conjunction with the Company's execution of the Second Lien Credit Facility (as defined and described below). Of the net realized proceeds of the Second Lien Credit Facility, totaling $94.6

- 4 -

million, approximately $91.7 million was used to repay amounts outstanding under the First Lien

Credit Facility, including prepayment of $65.0 million of the existing First Lien Term Loan,

permanently reducing the then outstanding balance to $90.0 million, and repayment of the total

amount outstanding of $26.7 million under the First Lien Revolving Credit Facility (which

remained available for re-borrowing and, as discussed below, was subsequently re-borrowed in

full). Borrowings under the First Lien Credit Facility bear interest at the alternate base rate

(defined as the higher of the prime rate or the Federal Funds Rate plus 0.50%) plus an interest

margin of 3.00%.

13.    The financial covenants of the First Lien Credit Facility require the

Company to meet minimum EBITDA, maximum first lien and total secured leverage, and capital

expenditure requirements. The Company did not satisfy these requirements as of December 31,

2005 and March 31, 2006. In March 2006, the Company obtained waivers from the First Lien

Credit Facility lenders (the "First Lien Lenders") that, among other things, waived until May 10,

2006 the requirement that the Company comply with the December 31, 2005 and March 31,

2006 financial covenants, and eliminated the requirement that the audit opinion relating to the

December 31, 2005 financial statements be unqualified and not contain a "going-concern"

qualification or other qualifications. Effective May 10, 2006, the First Lien Lenders agreed to

extend the waiver period until the earliest to occur of: (i) any Event of Default (as defined in the

First Lien Credit Facility), other than those already waived; (ii) delivery of a required five-day

advance notice that the Company intends to pay the semi-annual interest on the Notes (as defined

and described below), due May 15, 2006; and (iii) 5:00 p.m. on June 14, 2005.

14.    As of March 31, 2006, the borrowings outstanding under the First Lien

Term Loan were approximately $78 million. There were no funded borrowings outstanding

under the First Lien Revolving Credit Facility as of that date. As of March 31, 2006, the total

amount of letters of credit issued and outstanding under the LC Sub-Facility was $27.98 million.

Between March 31, 2006 and the Petition Date, the Company borrowed approximately $22

million under the First Lien Revolving Credit Facility and, as of the Petition Date, approximately

$28 million of letters of credit remained outstanding.

    (b)    <u>Second Lien Credit Facility</u>

    15.    On May 10, 2005, Werner DE entered into a Credit Agreement providing

an aggregate credit facility of $100.0 million (as amended, supplemented or otherwise modified,

the "Second Lien Credit Facility" and together with the First Lien Credit Facility, the "Pre-

Petition Credit Facilities"). Credit Suisse First Boston serves as the administrative agent (the

"Junior Pre-Petition Agent") under the Second Lien Credit Facility. The net proceeds realized

under the Second Lien Credit Facility was $94.6 million, of which $91.7 million was used to

repay amounts outstanding under the First Lien Credit Facility (as described above). The

remaining cash was retained for general corporate purposes.

    16.    Currently, borrowings under the Second Lien Credit Facility bear interest

at the alternate base rate (defined as the higher of the prime rate or the Federal Funds Rate plus

0.50%) plus an interest margin of 9.00%. Of this amount, 1.50% of the interest payable will be

capitalized as additional loans under the Second Lien Credit Facility instead of being paid in

cash.

    17.    The Second Lien Credit Facility is secured by substantially all of the

assets of Werner DE and its subsidiaries consistent with the collateral securing the First Lien

Credit Facility, and is guaranteed by each guarantor under the First Lien Credit Facility. The

- 6 -

liens securing the Second Lien Credit Facility are second in priority to the liens securing the First Lien Credit Facility.

18.    As with the First Lien Credit Facility, the financial covenants of the Second Lien Credit Facility require the Company to meet maximum secured leverage and capital expenditure requirements. The Company did not satisfy these requirements as of December 31, 2005 and March 31, 2006. In March 2006, the Company obtained waivers from the Second Lien Credit Facility lenders (the "Second Lien Lenders") that, among other things, waived until May 10, 2006 the requirement that the Company comply with the December 31, 2005 and March 31, 2006 financial covenants and eliminated the requirement that the audit opinion relating to the December 31, 2005 financial statements be unqualified and not contain a "going-concern" qualification or other qualifications. Effective May 10, 2006, the Second Lien Lenders agreed to extend the waiver period until the earliest to occur of: (i) any Event of Default (as defined in the Second Lien Credit Facility), other than those already waived; (ii) delivery of a required five-day advance notice that the Company intends to pay the semi-annual interest on the Notes, due May 15, 2006; and (iii) 5:00 p.m. on June 14, 2005.

19.    As of March 31, 2006, $101.4 million was outstanding under the Second Lien Credit Facility.

(c)    Intercreditor Agreement

20.    The First Lien Lenders, the Second Lien Lenders and the Debtors entered into an intercreditor agreement, dated as of May 10, 2005 (the "Intercreditor Agreement"), which govern their respective rights to the collateral, among other things.

21.    The Intercreditor Agreement restricts the Second Lien Lenders' ability to contest the Debtors' request for authority to enter into the DIP Credit Agreement, and to seek adequate protection that is different than that provided to the Senior Pre-Petition Agent on behalf of the First Lien Lenders.  Specifically, pursuant to the Intercreditor Agreement, the Junior Pre-Petition Agent, for itself and on behalf of the Second Lien Lenders, agreed that (i) any replacement liens granted to the Junior Pre-Petition Agent as adequate protection would be subordinated to the liens granted to the DIP Lenders under the DIP Credit Agreement and the replacement liens granted to the Senior Pre-Petition Agent as adequate protection, (ii) any administrative expense claim granted to the Junior Pre-Petition Agent as adequate protection would be subordinated to the administrative expense claims granted to the DIP Lenders and the administrative expense claim granted to the Senior Pre-Petition Agent, (iii) it would not object to the Debtors' use of Cash Collateral or to post-petition financing having terms and conditions as contemplated by the Interim Order, the Final Order and the DIP Credit Documents and (iv) it would not request adequate protection or any other relief in connection with the Debtors' entry into the DIP Facility or the use of Cash Collateral, except as expressly agreed by the Senior Pre-Petition Agent or to the extent otherwise permitted under the Intercreditor Agreement.

(d)    A/R Securitization

22.    On May 10, 2005, Werner Co. entered into a Purchase and Sale Agreement with Werner Funding Corporation, Inc. ("Werner Funding"), a wholly owned special purpose subsidiary of Werner Co., under which Werner Co. agreed to sell to Werner Funding, on a continuous basis, accounts receivable in exchange for cash and interest bearing notes.

23.    Also on May 10, 2005, Funding entered into an Accounts Receivable Financing Facility (the "A/R Securitization") with The CIT Group that provides a maximum

- 8 -

$50.0 million revolving line of credit based on a borrowing base calculation. The amount available under the A/R Securitization is determined weekly, and is based on 82% of Werner Funding's "eligible accounts receivable" (as defined in the A/R Securitization) reduced by certain amounts that primarily reflect the risk profile of Werner Co.'s customers. The A/R Securitization expires on the earlier of May 31, 2009 or upon the termination of the First Lien Credit Facility. Borrowings under the A/R Securitization are secured by the assets of Werner Funding.

24.     Werner Co. will use a portion of the proceeds of the DIP Term Loan (as that term is defined in the Debtors' motion to obtain postpetition financing) to re-purchase accounts receivables sold pursuant to the A/R Securitization and discontinue its practice of selling the Debtors' accounts receivable to Werner Funding.[3] Such accounts receivable will then become part of the collateral securing the interests of any debtor in possession lender, the First Lien Lenders and Second Lien Lenders.

25.     As of May 31, 2006, the borrowings outstanding under the A/R Securitization were approximately $48 million, and no more borrowings are available.

(e)     Industrial Building Revenue Bonds

26.     Variable Rate Demand Industrial Building Revenue Bonds totaling $5.0 million (the "Bonds") were issued in 1990 in order to finance the Company's acquisition of land and equipment, and the subsequent construction of a climbing products manufacturing facility located in Carrollton, Kentucky. The Bonds are secured by a stand-by letter of credit issued under the First Lien Credit Facility. The Debtors' chapter 11 filing is a default under the bonds

---

[3]     In addition to the amount outstanding on the loan, the prepayment cost under the A/R Securitization is 1% of outstanding obligations thereunder.

permitting the trustee to draw under the letter of credit.  The bonds are scheduled to mature in 2015.

      (f)    Capitalized Leases

      27.    As of March 31, 2006, the Company has approximately $16.3 million of capitalized leases obligations.

      (g)    Notes

      28.    Werner DE issued notes pursuant to an indenture dated November 24, 1997 (the "Notes").  The principal amount of the Notes is $135.0 million, and the Notes mature on November 15, 2007.  Interest on the Notes is payable semi-annually in arrears on May 15 and November 15.

      29.    The Notes are general unsecured obligations of Werner DE, ranking subordinate in right of payment to all existing and future senior indebtedness of Werner DE.  The Notes rank pari passu in right of payment with all other indebtedness of Werner DE that is subordinated to the senior indebtedness of Werner DE.  The Notes are guaranteed by Werner PA and Werner DE's wholly owned subsidiaries, except for Funding.

      30.    As of March 31, 2006, $134.3 million was outstanding under the Notes (after deducting unamortized financing costs and before adding accrued interest).

      (h)    Ownership

      31.    The ownership structure of Werner PA, the ultimate parent company of the Debtors, is comprised of preferred stock and common stock.  As of May 10, 2006, approximately 98.65% of the shares of preferred stock in Werner PA were owned by Green Equity Investors III, L.P., an affiliate of Leonard Green & Partners L.P.  As of May 10, 2006, Investcorp Werner Holdings L.P. owned approximately 41.25% of the shares of common stock

- 10 -

in Werner PA, and a large, disparate group of Werner family members owns a minority portion

of the of the shares of Werner PA common stock.  As stated above, Werner PA owns 100% of

the equity of Werner DE, which owns 100% of the equity of Werner Co, which, in turn, owns

100% of the equity of WIP Technologies, Inc.

C.      Summary of Events Leading to Chapter 11

        32.      The Debtors are highly-leveraged and are facing the maturity of

significant portions of debt in their current capital structure.  At the same, the Debtors are in the

process of undergoing a significant operational restructuring, which includes transferring

operations to a new facility in Juarez, Mexico.  Additionally, the Debtors are a major consumer

of aluminum.  In the last several months, the market price for aluminum has increased

dramatically and, as a result, the Debtors have experienced significant constraints on profit

margins and liquidity.

        33.      The Debtors have retained Rothschild Inc. ("Rothschild") as their financial

advisors and investment bankers, and Loughlin Meghji & Company ("LM+Co") as their

restructuring consultants to assist them in identifying and considering options relating to

refinancing, raising new capital and restructuring existing debt.  In this role, Rothschild and

LM+Co have explored out-of-court restructuring options and have entered into discussions with

the Debtors' prepetition lenders to pursue a consensual restructuring of their debt.  The Debtors

have pursued other alternatives to improve their liquidity position, including the sale of certain

business segments and other assets.  However, due to their current liquidity constraints, the

Debtors are forced to seek to reorganize utilizing the protections available to them under chapter

11 of the Bankruptcy Code.

- 11 -

**FACTS IN SUPPORT OF FIRST DAY APPLICATIONS AND MOTIONS**

      34.    Concurrently with the filing of their chapter 11 petitions, the Debtors are

seeking orders approving the First Day Pleadings (collectively, the "First Day Orders"). The

Debtors request that each of the First Day Orders described below be entered, as each constitutes

an integral element in maximizing the value of these estates for the benefit of all parties in

interest.

      35.    In connection with the preparation for these bankruptcy cases, I have

reviewed each of the First Day Pleadings referenced below. As set forth more fully below, I

believe that the entry of orders granting the relief requested in these motions and applications is

critical to the Debtors' ability to preserve the value of their estates.

A.    Joint Administration of Chapter 11 Cases

      36.    The Debtors seek the joint administration of their chapter 11 cases, four in

total, for procedural purposes only. I believe that it would be far more practical and expedient

for the administration of these chapter 11 cases if the Court were to authorize their joint

administration. Many of the motions, hearings, and other matters involved in these chapter 11

cases will affect all of the Debtors. Hence, joint administration will reduce costs and facilitate

the administrative process by avoiding the need for duplicative notices, applications, and orders.

Doing so will not only be more efficient, but also will allow the process to be unencumbered by

the procedural problems normally attendant to the administration of separate, albeit related,

chapter 11 cases. Moreover, no prejudice will befall any party by the joint administration of the

Debtors' cases as the relief sought herein is solely procedural and is not intended to affect

substantive rights.

                                      

B.      Applications to Retain Professionals

37.      The Debtors intend to file and serve certain applications, upon the scheduling of a further hearing by the Court, to retain professionals who will assist the Debtors in the administration of these chapter 11 cases.  Among certain other professionals, the Debtors will seek to retain Young Conaway Stargatt & Taylor, LLP ("Young Conaway") and Willkie Farr & Gallager LLP ("WF&G") as bankruptcy co-counsel with regard to the filing and prosecution of these chapter 11 cases.  In addition, the Debtors will seek to retain Rothschild as financial advisors and investment bankers and LM+Co as restructuring consultants.

38.      At the First Day Hearing, the Debtors will seek to retain Kurtzman Carson Consultants LLC ("KCC") as the Court's notice, claims, and balloting agent for the Debtors' chapter 11 cases.  Pursuant to Delaware Bankruptcy Court Local Rule 2002-1(f), the Court may authorize the retention of a notice, claims, and balloting agent without the need to provide notice to any other parties.  I believe that the retention of KCC is critical because of the large number of creditors identified in these cases (over 11,000 creditors on a consolidated basis).

39.      I understand that KCC is a data processing firm with extensive experience in noticing, claims processing, balloting, and other administrative tasks in chapter 11 cases.  Given the need for the services described above and KCC's expertise and experience in providing such services, I believe that retaining KCC will expedite service of notices, streamline the claims administration and balloting processes, and permit the Debtors to focus on their attempted reorganization.

C.      Adequate Assurance to Utilities

40.      In connection with the operation of their business and management of their properties, the Debtors obtain water, natural gas, electricity, telephone, and other similar

- 13 -

utility products and services (collectively, the "Utility Services"), from approximately 26 utility companies (collectively, the "Utility Companies") throughout the United States. The Debtors are seeking an order of this Court, pursuant to section 366 of the Bankruptcy Code, prohibiting the Utility Companies from altering or discontinuing services and deeming the Utility Companies adequately assured of future performance by virtue of the Debtors' proposed adequate assurance. In particular, the Debtors propose to provide a deposit equal to two weeks of utility service, calculated as a historical average over the past 12 months, to any Utility Company who requests such a deposit (the "Adequate Assurance Deposit"), provided that such requesting Utility Company does not already hold a deposit equal to or greater than two weeks of utility services, and provided further that such Utility Company is not currently paid in advance for its service.

41.    I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Companies. However, in light of the severe consequences to the Debtors of any interruption in services by the Utility Companies and the recognition that Utility Companies have the right to evaluate the Proposed Adequate Assurance on a case-by-case basis, if any Utility Company believes additional assurance is needed, the Debtors have proposed procedures for the Utility Companies to request such additional adequate assurance. Furthermore, the Debtors fully intend to timely comply with their postpetition obligations to Utility Companies.

42.    I believe that without the relief requested in this motion, the Debtors could be forced to address numerous requests by Utility Companies in an unorganized manner at a critical period in their reorganization efforts, and during a time when their efforts could be more productively focused for the benefit of all of their stakeholders.

- 14 -

D.    Cash Management Motion

        43.    In the ordinary course of business prior to the Petition Date, the Debtors used a centralized cash management system which is similar to those utilized by other major corporate enterprises.  Werner Co. maintains, as of the Petition Date, approximately sixteen (16) active bank accounts at eight (8) different banks.  The other Debtors each maintain a single account used for general disbursements.  The Debtors' cash management system is designed to collect, transfer, and disburse efficiently funds generated through the Debtors' operations.

      (a)    Collections and Deposits

        44.    Werner Co. routinely receives cash, via check or wire transfer, on account of accounts receivable (the "A/R Cash Receipts") as well as cash unrelated to accounts receivable (the "Non A/R Cash Receipts"), such as royalty payments, monies received from freight carriers for inventory damaged in transit and interest received from PNC Bank on funds invested overnight.

      (b)    Cash Flow

        (i)    Non A/R Cash Receipts

        45.    The Non A/R Cash Receipts received via wire transfer are deposited directly into a concentration account maintained with PNC Bank (the "PNC Concentration Account").  Non A/R Cash Receipts received via check are deposited into a deposit account with First National Bank and then, upon a drawdown wire request by Werner Co. – which occurs one to two times a week – transferred to the PNC Concentration Account.

        (ii)    A/R Cash Receipts

        46.    Werner Co., a Debtor, entered into a Purchase and Sale Agreement (the "Sale Agreement") with Werner Funding Corporation ("Funding"), a wholly owned subsidiary

- 15 -

of Werner Co., on May 5, 2005, pursuant to which Werner Co. sells to Funding, on a continuous basis, accounts receivable in exchange for cash and interest bearing notes. To pay for such purchases, Funding entered into an Accounts Receivable Financing Facility (the "Receivables Credit Facility") with CIT Group Business Credit, Inc. ("CIT"), which provides Funding with a $50 million revolving line of credit.

47.     In accordance with the terms of the Sale Agreement and the Receivables Credit Facility, A/R Cash Receipts are either: (i) deposited directly into a blocked account maintained by PNC Bank (the "PNC Blocked Account"); (ii) initially deposited into various lockbox accounts maintained by Funding and then swept into the PNC Blocked Account; or (iii) initially deposited into an account maintained at First National Bank and then deposited via ACH transfer into the PNC Blocked Account. Available funds in the PNC Blocked Account are then automatically transferred to CIT's bank account maintained at JPMorgan Chase Bank (the "CIT Account"). The funds do not remain in the CIT Account overnight; rather, Werner Co. submits daily advance requests to CIT to transfer the funds held in the CIT Account to the PNC Concentration Account, which holds and invests the funds overnight.

48.     Contemporaneously herewith, the Debtors seek authority to enter into the Superpriority Debtor-In-Possession Credit and Guaranty Agreement (the "DIP Agreement"). Immediately following interim approval of the DIP Agreement, the Debtors intend to utilize a portion of the proceeds available under the DIP Agreement to repurchase their accounts receivables, and thereafter will cease selling accounts receivables to Funding. This event may cause the Debtors' cash flow system to be altered, particularly with respect to A/R Cash Receipts. Accordingly, the Debtors request authority to maintain the current cash management system, subject to any alterations required by the Court-approved DIP Agreement.

- 16 -

(c)    Disbursements

49.    Wires and automated clearinghouse transfers to vendors are made directly from the PNC Concentration Account. Werner Co. also maintains nine special purpose disbursement accounts (each a "Disbursement Account," and collectively, the "Disbursement Accounts") with PNC Bank. The Disbursement Accounts are all funded from the PNC Concentration Account. Six of the Disbursement Accounts are utilized for payroll purposes. The other three are disbursements accounts, two of which are used to make general disbursements for Werner Co. and Werner Holding Co (PA), Inc., respectively, and the other is used for employee/employer healthcare savings disbursements.

50.    By this motion, the Debtors are seeking entry of an order, pursuant to section 105(a) and 345 of the Bankruptcy Code, and subject to the DIP Agreement: (i) authorizing the continued use of their centralized cash management system and procedures, subject to the potential modifications described in the motion; (ii) authorizing the maintenance and continued use of their existing bank accounts; (iii) waiving certain operating guidelines relating to bank accounts set forth in the U.S. Department of Justice, Office of the U.S. Trustee: Operating Guidelines for Chapter 11 Cases, adopted by the Office of the United States Trustee for the District of Delaware; and (iv) extending the Debtors' time to comply with, and potentially waiving the requirements of, section 345 of the Bankruptcy Code.

51.    I believe the relief requested in the motion will help ensure the Debtors' orderly entry into chapter 11 and will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

- 17 -

E.     Motion Authorizing Payment of Prepetition Wages,
       Compensation, and Employee Benefits

52.    The Debtors request that this Court enter an order:  (i) authorizing, but not directing, the Debtors to: (a) pay and/or perform, as applicable, prepetition obligations to current Employees, including accrued prepetition wages, salaries, and other cash and non-cash compensation claims (collectively, the "Employee Wage Claims"); (b) pay all prepetition fee and expense obligations to Independent Contractors; (c) continue the Debtors' various non-working day policies, employee benefit plans and programs, and certain retiree medical and life insurance plans and programs (collectively, the "Employee Benefit Obligations"); (d) reimburse Employees for Employee Expense Obligations; and (e) pay all related prepetition withholdings and payroll-related taxes (the "Employer Taxes"); (ii) authorizing and directing PNC Bank to receive, process honor and pay all of the Debtors' prepetition checks and fund transfers on account of any of the Prepetition Employee and Independent Contractor Obligations; (iii) prohibiting PNC Bank from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee, Independent Contractor, or other party for Prepetition Employee and Independent Contractor Obligations; and (iv) authorizing the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee and Independent Contractor Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

(a)     Employees

53.    The Debtors currently employ approximately 1,189 Employees who provide a variety of services to support the Debtors' operations.  Approximately 99% of the Employees are full-time, working at least 40 hours per week.  The Debtors' average monthly

- 18 -

payroll for all of the Employees is approximately $4.159 million.  Approximately 64% of all Employees are hourly wage earners, while the remaining 36% are salaried personnel.

54.     The Debtors' hourly Employees are paid on a weekly basis, one week in arrears.  The next payroll for the Debtors' hourly Employees is scheduled to be paid on June 16, 2006 for the period ending June 11, 2006.  The Debtors estimate that the aggregate prepetition Employee Wage Claims with respect to the June 16, 2006 payroll for hourly Employees will equal approximately $441,635.  The Debtors do not believe any hourly Employee is owed more than $10,000 in accrued wages.

55.     The Debtors' salaried Employees are paid on a bi-weekly or weekly basis, except for Salaried Overtime Payments, which are paid two weeks in arrears.  The Debtors' typical bi-weekly payroll for salaried Employees is approximately $1.036 million.  Such payroll includes, on average, approximately $52,100 in Salaried Overtime Payments.  The Debtors believe that the only prepetition Employee Wage Claims for their salaried Employees would be for Salaried Overtime Payment, which would not exceed $10,000 to any one Employee.

56.     In addition to the Employee Wage Claims, the Debtors are obligated to pay certain taxes, including FICA (Social Security and Medicare), federal, state, and, in some instances, local income and other payroll taxes on behalf of the Employees ("Employer Taxes").  A portion of such payments represent amounts withheld from Employees' paychecks, and the remainder of such payments represents required employer contributions.  Additionally, from time to time, the Debtors are required, by order of a court, to garnish wages (such wages, "Garnished Wages") from an Employee's paycheck.

- 19 -

065391.1001

(b)     Independent Contractors

57.     To supplement their workforce, the Debtors utilize the services of a number of Independent Contractors to perform a variety of services for various departments, including, but not limited to: corporate finance, corporate office operations, information systems, manufacturing, sales, and warehousing.  The Debtors estimate that, as of the Petition Date, they owe Independent Contractors the aggregate amount of approximately $22,000 (this amount excludes any checks which may not have cleared).

(c)     Vacations, Sick Days, and Holidays

(i)     Vacations: All full-time salaried and hourly Employees are eligible to accrue paid vacation time ("Vacation Time").  The Debtors only pay an Employee for outstanding accrued and unused Vacation Time upon conclusion of such Employee's employment.  The Debtors estimate that the total dollar amount owed on account of accrued Vacation Time (if all accrued but unused Vacation Time were to be paid in cash, which, pursuant to the Debtors' Vacation Policy, most of it should not) is approximately $1,739,102. However, the total amount of payments actually made to departing Employees on account of unused Vacation Time in 2005 was approximately $515,000.

(ii)    Random Hours: After completing one year of service all full-time, salaried Employees are eligible for up to eighty hours per calendar year of paid absence ("Random Hours") for short-term illness and/or important personal business not normally handled while on vacation (e.g., settling estate matters following the death of a relative, real estate closings, parent-teacher conferences, etc.).

(iii)   Sick Leave and Salary Continuation: If any of the Debtors' full-time, salaried Employees are unavailable for work because of illness, injury, pregnancy, surgery, etc., for a period of more than three days, such Employees will be considered to be on sick leave. After two years of service with the Debtors and after exhausting all Random Hours, full-time salaried Employees who are considered to be on sick leave are entitled to salary continuation pay.

(iv)    Family and Medical Leave: Each eligible Employee is provided with a leave of absence for such Employee's own serious health condition, to care for a serious health condition of such

- 20 -

Employee's spouse, child, or parent, or to provide family care following the birth of a child or the placement of a child with the Employee for adoption or foster care ("Family and/or Medical Leave"). Leave taken pursuant to the Family and Medical Leave Policy is generally unpaid; however, an Employee may use and be paid for Random Hours, Salary Continuation Pay and Vacation Time during the period of such Employee's Family and Medical Leave.

(v)     Holidays: The Debtors provide all of their Employees with ten paid holidays per calendar year.

(d)     Employee Benefit Obligations

58.     In the ordinary course of business, as is customary with most large businesses, the Debtors have established various employee benefit plans, programs and policies. The primary Employee Benefit Obligations are described below.

(i)     Severance: All of Debtors' salaried Employees are eligible for severance payments ("Severance Allowance") in amounts ranging from one week of pay to 26 weeks of pay, depending upon the length of employment. A Severance Allowance is only provided in situations in which an Employee is terminated without cause and is not applicable to Employees who voluntarily resign, are discharged for cause or retire. In addition to the Severance Allowance, continued medical and dental coverage is extended, as though employment continued, for the duration of the Severance Allowance (such continued benefits, "Severance Benefits"). The Debtors estimate that such accrued but unpaid Severance Benefits totaled approximately $78,000 as of the Petition Date.

(ii)     Medical and Dental Insurance: The Debtors provide all of their full-time Employees with a number of Employee medical benefits pursuant to several different plans (collectively, the "Medical Plans"). Such Medical Plans include, but are not limited to, medical, prescription drug, and vision plans provided by various medical benefits providers. Collectively, the Medical Plans (including Union-related programs) cost the Debtors approximately $694,549 per month. The Debtors estimate that, as of the Petition Date, the Debtors' obligations with respect to accrued but unpaid Medical Plan costs aggregated approximately $263,649. In addition to the foregoing, prior to April 1, 2006, the Debtors provided self-insured medical coverage to their Employees. As of April 30, 2006, the Debtors' projection of

- 21 -

incurred but not yet reported claims under their former self-insured plan was approximately $297,000.  Dental coverage (such coverage, "Dental Benefits") is provided by the Debtors to all hourly and salaried Employees (except those hourly Employees at the Debtors' Chicago Facility) through a self-insured dental plan administered by United Concordia Companies, Inc.  The Debtors estimate that, as of the Petition Date, the Debtors' obligations with respect to accrued but unpaid Dental Benefits costs aggregated approximately $20,000.

(iii)   Life Insurance: The Debtors offer term life insurance to all salaried and hourly Employees (except for hourly Employees at the Debtors' Merced Facility), as well as to a select group of retired Employees, pursuant to group policies issued by Aetna Life Insurance Company of Hartford, Connecticut ("Aetna").  The Debtors estimate that, as of the Petition Date, the Debtors' obligations with respect to accrued but unpaid life insurance costs aggregated approximately $17,316.

(iv)   401(k) Plan: The Debtors offer a 401(k) plan (the "401(k) Plan") through which Employees can accumulate savings for the future.  As of the Petition Date, the Debtors estimate that they are holding approximately $41,000 in unremitted contributions to the 401(k)Plan.  Such amount includes contributions by Employees, Retirement Contributions, Debtors' matching contributions, and participant loan repayments.

(v)   Retirement and Defined Benefit Plans: The Debtors contribute $54 per month to a multi-employer pension plan for each hourly Employee at their Chicago Facility who is a member of the Allied Production Union.  Such contributions must be made by the tenth business day of the succeeding month.  The Debtors' estimated liability, as of the Petition Date, with respect to such contributions is $10,237.  The Debtors also sponsor the Werner Company Postretirement Welfare Benefits Program (the "Welfare Benefits Program"), which primarily provides medical benefits to certain Retirees.  In 2006, the Debtors' projected cash contribution to the Welfare Benefits Program is approximately $225,000.

(vi)   Other Benefits: In addition to the Employee Benefit Obligations described above, the Debtors offer numerous other benefit programs to various groups of Employees, including, but not limited to: continuing education assistance; leased vehicles for travel on behalf of the Debtors; group business travel accident insurance; relocation allowance; short- and long-term disability coverage; blackberries and cell phones; and other benefit

- 22 -

programs. The Debtors estimate that, as of the Petition Date, the amounts outstanding for all such programs is approximately $69,000.

    (e)    <u>Employee Business Expenses</u>

    59.    As is customary with most large businesses, the Debtors reimburse their Employees who incur and pay a variety of approved business-related expenses, in the ordinary course of performing their duties for the Debtors ("Employee Expense Obligations"). The Debtors estimate that approximately $130,000 in Employee Expense Obligations were outstanding as of the Petition Date.

    60.    I believe the Debtors' inability to pay the outstanding employee-related obligations will cause the Employees to endure significant stress, hardship and suffering. The effect of this disruption in employee morale will be to cause a devastating impact on the Debtors, its customers, the value of the assets and business, and the ability to reorganize. Therefore, I believe, authorizing, but not directing, the Debtors to pay the employee-related obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, their creditors and all parties in interest.

F.    <u>Authorization to Pay Sales, Use, and Other Trust Fund Taxes</u>

    61.    In the ordinary course of their business, the Debtors collect sales, use, and other trust fund taxes (collectively, the "Trust Fund Taxes") from third parties and hold them for a period of time before remitting them to the appropriate taxing authorities (the "Taxing Authorities"). Generally, these Trust Fund Taxes are paid in arrears. The Debtors estimate that they pay an average of approximately $14,120 in Trust Fund Taxes each month.

    62.    Certain Taxing Authorities either have not been paid or have been sent checks for Trust Fund Taxes that may or may not have been presented or cleared as of the

- 23 -

Petition Date. Similarly, in other cases, obligations have accrued or are accruing, or are subject

to audit or review, but have not yet become due and payable. Accordingly, the Debtors seek

authorization for their banks to honor prepetition wire transfer requests and checks issued by the

Debtors to the Taxing Authorities in payment of prepetition Trust Fund Taxes that, as of the

Petition Date, have not cleared or been transferred. In addition, to the extent Debtors have not

yet sought to remit payment to the Taxing Authorities with respect to certain Trust Fund Taxes,

the Debtors seek authorization to issue checks or provide for other means of payment to the

Taxing Authorities to the extent necessary to pay Trust Fund Taxes.

       63.    I have been advised that Trust Fund Taxes that have been collected or

withheld by the Debtors are held in trust for the benefit of those third parties to whom payment is

owed or on behalf of whom such payment is being made. Furthermore, I have been advised that

some of the Taxing Authorities may cause the Debtors to be audited if the Trust Fund Taxes are

not paid promptly, and many Taxing Authorities may also seek to impose personal liability on

the officers and directors of the Debtors for Trust Fund Taxes collected but not paid to such

Taxing Authorities. Such proceedings obviously would constitute a significant distraction for

the Debtors and their officers and directors at a time when they should be focused on stabilizing

postpetition business operations and developing and implementing a successful reorganization

strategy.

G.    <u>Authorization for the Continuation of Certain Customer Programs</u>

       64.    Prior to the Petition Date and in the ordinary course of their businesses,

the Debtors sought to develop and sustain a positive reputation in the marketplace through the

implementation of certain customer programs, including, without limitation: (i) volume rebates;

(ii) co-op advertising allowances; (iii) promotional allowances; (iv) returns / damaged goods

                                                   

allowances; (v) merchandising allowances; (vi) product show allowances; and (vii) allowances

for pricing errors, short shipments, and other customer deductions (collectively, the "Customer

Programs"). The Customer Programs are calculated based upon various factors related to a

customer's sales. Each Customer Program is unique and is negotiated to fit the unique attributes

of the particular customer. The Customer Programs are commonplace among the Debtors'

competitors. The universal goals of the Customer Programs are to meet competitive pressures,

maximize sales, ensure customer satisfaction, and generate brand loyalty and goodwill for the

Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing net

revenue.

65.     As of the Petition Date, the Debtors estimate a liability of $20 million for

the cost of Customer Programs. Many of these rebates and allowances, however, take the form

of credits applied to a particular customer's account. Hence, the Debtors expect their actual cash

liability to their customers with respect to the Customer Programs will be significantly less (i.e.

approximately $1 million).

66.     The Debtors' desire to continue during the postpetition period those

Customer Programs that they believe were beneficial to their businesses and cost-effective

during the prepetition period. In addition, certain of the Customer Programs may give rise to as

yet unperformed prepetition obligations of the Debtors, and may indeed evidence prepetition

claims against the Debtors. Thus, the Debtors also seek this Court's authority to perform, in

their discretion, their Customer Program obligations.[4]

---

[4]    Under certain of the Customer Programs, customers will accrue rebates or allowances monthly. Unless credited against a customer's account, these amounts would be held in escrow and paid to the customer, whether monthly, quarterly, or annually.

- 25 -

67.    The commencement of the Debtors' chapter 11 cases will no doubt create apprehension on the part of customers or potential customers regarding their willingness to commence or continue doing business with the Debtors.  I believe that without the requested relief, the stability of the Debtors' business will be significantly undermined, and otherwise loyal customers may explore alternative sources for their climbing products.  The damage that would result if the Debtors failed to honor their prepetition obligations with respect to Customer Programs significantly outweighs any detriment to the Debtors' creditors or their estates.

H.    Reclamation, Goods in Transit, Postpetition Returns Motion

68.    In order to obtain and ensure timely delivery from their suppliers and vendors (together, the "Vendors") of materials, supplies, goods, products and related items (collectively, the "Goods"), the Debtors seek entry of an order: (i) confirming the grant of administrative expense status to obligations arising from postpetition delivery of goods; (ii) establishing authority to pay certain expenses in the ordinary course of business; (iii) authorizing, but not directing, the Debtors to return goods to vendors pursuant to Bankruptcy Code section 546(h); and (iv) establishing procedures for reconciliation of valid reclamation claims.

69.    Absent the relief requested in this motion, the Debtors would be required to expend substantial time and limited resources to: (a) convince the Vendors of the Debtors' authority to make certain payments; (b) reissue outstanding orders; (c) establish their right to retain the Goods; (d) contest and/or litigate numerous individual reclamation demands; and/or (e) return repeatedly to this Court to enforce their rights with respect to Goods in transit or Goods sought to be reclaimed.  Any delay or disruption in the continuous flow of Goods to the Debtors could diminish or even shut down the Debtors' business.  This is because the Debtors are dependent on third-party vendors and manufacturers for the products they provide to their own

- 26 -

customers. Simply put, any material disruption puts the Debtors in peril. Consequently, the relief requested herein is in the best interests of creditors and the estates.

    (a)    Confirmation of Administrative Status

        70.    Although the Debtors believe that they have the authority to make payment for Goods received postpetition (irrespective of the time the orders were first placed), confirmation of that authority is highly desirable. The Debtors' relationship with their Vendors is so essential that it is important to give them the utmost reassurance that their valid claims will be given administrative expense priority status, and that they will continue to be paid by the Debtors in the ordinary course of business.

    (b)    Return of Goods

        71.    I believe that an order approving returns of unwanted or unsalable Goods to Vendors for credit against their prepetition claims, subject to the limitations set forth in this motion, will enable the Debtors to: (a) obtain proper credit for otherwise unusable Goods, cost-effectively and without undue financial risk; and (b) effectively manage inventory, enhancing the Debtors' financial performance, the value of the assets of the estates and the prospects of a successful reorganization.

    (c)    Procedures for Reconciliation of Reclamation Claims

        72.    The Debtors believe that many Vendors will attempt to assert their right to reclaim Goods delivered to the Debtors shortly before or soon after the Petition Date. In the absence of approved procedures for the processing and reconciliation of such demands, numerous reclamation demands could adversely affect the Debtors' operations in the critical period immediately after the Petition Date. I believe that the procedures set forth in the motion for processing and reconciliation of reclamation claims will facilitate the continued operation of

- 27 -

the Debtors' businesses and should obviate any Vendor's perceived need to initiate legal action

to preserve its rights, thereby minimizing potential costs to the Debtors' estates in responding to

such litigation.  Moreover, the disruption caused by having to administer and analyze

reclamation claims during the first few weeks of these bankruptcy cases would seriously distract

the Debtors' management and professionals at a critical period in these cases.

I.      Freight Carrier / Warehouse Motion

        73.     The Debtors seek authority to pay, in the Debtors' sole discretion, the

prepetition claims of certain freight carriers, warehouse providers, and freight forwarders.

        (a)     Freight Carriers and Warehouse Providers

        74.     In connection with the day-to-day operation of their businesses, the

Debtors rely on numerous freight companies operated by third parties (collectively, the "Freight

Carriers") to transport goods before, during, and after the manufacturing process.  As a result, the

Freight Carriers regularly have possession of certain of the Debtors' materials or products in the

ordinary course of their businesses.  The Debtors also supplement their own storage and

distribution facilities with several third-party warehouse facilities located throughout the country

(collectively, the "Warehouse Providers").  Each Warehouse Provider possesses raw materials,

finished goods, or products of the Debtors.

        75.     As of the Petition Date, many of the Freight Carriers had claims on

account of transportation and related services previously provided to the Debtors (collectively,

the "Freight Claims").  Similarly, certain of the Warehouse Providers, who are compensated

based upon contractual rates and terms agreed to between the Debtors and each of the

Warehouse Providers, also possess claims against the Debtors for unpaid warehouse charges (the

"Warehouse Charges").  The Debtors estimate that, as of the Petition Date, the aggregate amount

- 28 -

of prepetition Freight Claims is approximately $2,854,000, and the aggregate amount of prepetition Warehouse Charges is approximately $546,000.

76.    It is essential for the Debtors' continuing business viability and the success of their restructuring efforts that they maintain the reliable and efficient flow of raw materials and goods through their manufacturing and distribution systems.  Even a minor delay could undermine the Debtors' ability to meet internal production schedules or fulfill their customers' supply needs.  Such disruptions also would likely cause the Debtors' relationships with their customers to be severely, and possibly irreparably, impaired.  As a result, the Debtors' ability to effect a successful restructuring would be immediately jeopardized.  This is particularly so where, as here, the Debtors' customers may already be tempted to source their supplies elsewhere due to the Debtors' chapter 11 filings.

77.    Moreover, ladders are difficult to ship and store because of their large, irregular shape.  There is only one major Freight Carrier that will deliver the kinds of products that the Debtors ship.  Indeed, the Freight Carriers and Warehouse Providers utilized by the Debtors represent a network that the Debtors have worked 15 to 20 years to cultivate. Alternative providers would be difficult and, in certain instances, nearly impossible to find.  And even if suitable alternative freight carriers were available, the time necessary to identify these replacement providers and integrate them into the Debtors' operations likely would cause a significant disruption to the Debtors' manufacturing and distribution systems.

78.    Freight Carriers and Warehouse Providers also may argue that they are entitled to possessory or similar liens under state law for the storage and/or transport of the goods in their possession as of the Petition Date.  If so, those entities may refuse to deliver or release such goods before their claims have been satisfied.

- 29 -

79.     Accordingly, I believe it is imperative that the Debtors obtain authority to pay the Freight Claims and Warehouse Charges to: (a) ensure that the essential services provided by the Freight Carriers are available to the Debtors without interruption; and (b) preserve to the fullest extent possible the Debtors' relationships with their customers and, in turn, the value of the Debtors' businesses for the benefit of all stakeholders.

(b)     Freight Forwarders

80.     The Debtors also utilize the services of certain freight forwarders (the "Freight Forwarders"). The Freight Forwarders provide vital services that enable the Debtors to comply with the complex customs laws and regulations of the United States when importing product from outside the United States. Among other things, the Freight Forwarders provide the back-office services necessary for customs clearance, prepare import summaries, facilitate exportation of the Debtors' products, obtain tariff numbers, and perform numerous other critical services for the Debtors. The Debtors pay the Freight Forwarders for their services and reimburse the Freight Forwarders for any funds advanced on behalf of the Debtors to pay fees to the United States Customs Service ("Customs Service"), as well as for charges of certain ocean, air, and land shippers, and certain miscellaneous storage and handling expenses (collectively, the "Freight Forwarder Claims"). The Debtors estimate that, as of the Petition Date, the aggregate amount of prepetition Freight Forwarder Claims was approximately $600,000.

81.     Sourcing goods and materials overseas has become an increasingly important part of the Debtors' business and strategy. I believe that the Debtors must pay the Freight Forwarder Claims to prevent any disruption in the essential services that the Freight Forwarders provide. The Debtors believe that the Freight Forwarders will refuse to continue to make further advances and pay custom duties on time if the outstanding Freight Forwarder

- 30 -

Claims remain unpaid. Hence, the nonpayment of the Freight Forwarder Claims would lead to a severe disruption in the Debtors' integrated distribution system and potentially cause irreparable damage to the Debtors' relationship with customers whose orders go unsatisfied. Such nonpayment also may result in the imposition of Customs Service sanctions against the Debtors, including fines and storage fees.

82. Moreover, even if the Debtors could replace the Freight Forwarders with other freight forwarders willing to perform the same services, there is no guarantee that the services would be available either on a timely basis or on terms as favorable as those the Debtors currently enjoy. It is also likely that any replacement freight forwarder would demand payment in advance, given the nonpayment of the Freight Forwarders' outstanding claims. Moreover, the current import and export system is designed to enable goods to flow to the Debtors and their customers, from carrier to carrier, without any interruption for Customs Service processing. The Freight Forwarders know how this delivery system works, but there is no guarantee that any replacement customs brokers could learn the system in sufficient time to prevent its breakdown and the consequential costs and delays.

J. Section 503(b)(9) Motion

83. The Debtors seek entry of an order authorizing them to pay, in the ordinary course, obligations owing to certain suppliers and vendors entitled to an administrative claim, pursuant to section 503(b)(9) of the Bankruptcy Code, arising from goods received by the Debtors from such suppliers and vendors in the ordinary course of business within 20 days before the Petition Date (the "Priority Vendors" and the claims of such Priority Vendors, "Priority Vendor Claims") in an amount not to exceed $2 million.

84.     In the ordinary course of the Debtors' business, numerous Priority Vendors provide the Debtors with goods that are essential to the sustained operations of the Debtors during the reorganization period. I believe that if the Priority Vendors are not paid in the ordinary course on account of their Priority Vendor Claims, such Priority Vendors may refuse to continue providing the Debtors with goods after the Petition Date. Because the Debtors' primary business is the manufacture of climbing products made from raw materials and component parts supplied by Priority Vendors, any delay or disruption in the continuous flow of goods to the Debtors could result in an immediate shut down of the Debtors' business. I believe an order of this Court confirming that all obligations of the Debtors to Priority Vendors will help ensure continuous delivery of goods to the Debtors.

K.     Motion to Pay Critical Vendors and Service Providers

85.     The Debtors, seek entry of an order authorizing them to pay obligations owing to certain critical vendors and service providers (collectively, the "Critical Vendors") in an amount not to exceed $6.8 million.

86.     The Debtors have determined that replacing the Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible. In order to determine which of the Debtors' vendors are critical to the Debtors' business, the Debtors used the following criteria: (a) whether the vendor in question is a "sole-source" provider; (b) whether quality requirements or other specifications prevent the Debtors from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; (c) if a vendor is not a sole-source provider, whether the Debtors have sufficient product in inventory to continue operations while a replacement vendor is put in place; and (d) whether a vendor meeting the standards of (a) or (b) is likely to refuse to ship product to the Debtors postpetition if its prepetition balances are not

- 32 -

paid.  The Debtors are confident that this process has appropriately identified only those

vendors/providers that meet the foregoing stringent guidelines.

      87.    The Critical Vendors include:

      (a)    <u>Suppliers of Whole Goods</u>: Many of the Critical Vendors supply the Debtors with whole goods or customized products, which the Debtors then sell directly to their customers.  Such custom products are tested and approved by the Debtors to ensure compliance with the Debtors' requirements, as well as those set by the American National Standards Institute ("ANSI") and the Occupational Safety and Health Administration ("OSHA").  To ensure that any new suppliers selected to replace existing vendors would provide goods of the same quality, the new suppliers first would have to go through the Debtors' qualification process.  This process entails potential suppliers creating samples of the customized products that would then be inspected and tested by the Debtors.  Given the time it takes to make and inspect the samples, it could take six months or more to replace the Debtors' whole goods suppliers.  And given that the Debtors do not maintain inventories of whole goods, any conversion to a new supplier would substantially disrupt and diminish the Debtors' sales of whole goods to their customers, which would have a disastrous impact on the Debtors' profitability and liquidity.  Moreover, the Debtors anticipate that current suppliers of whole goods would begin selling their whole goods direct to the Debtors' customers or through one of the Debtors' competitors, thereby creating additional competition which could destroy this portion of the Debtors' business.

      (b)    <u>Suppliers of Components</u>: Many Critical Vendors supply component parts that are used in the production of the Debtors' climbing equipment or in the Debtors' customized machinery.  Like whole goods, climbing equipment components supplied by the Critical Vendors, such as fasteners and injection moldings, are custom products that have been inspected and tested to ensure compliance with the Debtors' standards, as well as those of ANSI and OSHA.  Accordingly, significant lead time would be needed to replace these Critical Vendors with other suppliers.  During the interim period, the Debtors would have to halt production of certain products, which would have a crippling effect on their business.  Additionally, the Debtors utilize custom machinery to produce certain of their products.  There are only a select number of vendors who provide customized component parts for such machinery.  To find replacement vendors that could make the

customized components could take many months, during which
time the production of several products would be delayed or halted
altogether.

(c)  Raw Materials Providers: Certain Critical Vendors supply the
Debtors with the raw materials used in the production of the
Debtors' climbing products.  The raw materials provided by these
Critical Vendors are not interchangeable with raw materials from
other vendors, who do not produce similar grades of the raw
material, and whose raw materials have not been qualified for use
in production of the Debtors' products.  Even if it were possible to
find replacement suppliers of raw materials – which the Debtors
cannot be certain of – the Debtors expect it would take a
significant amount of time to do so, and that the cost associated
with such a search would be prohibitive.

(d)  Key Service Providers: The Debtors rely on certain key service
providers that are crucial to the smooth operation of their business.
For example, there are only a select number of service providers
that have the technical knowledge and ability to service the
Debtors' custom machinery.  If these service providers
discontinued their services, the Debtors might not be able to
continue using their custom machinery, which, in turn, could halt
production of several products.  The Debtors also rely on third
party providers for administrative and back office services.
Without the continued assistance of such providers, the operation
of this critical aspect of the Debtors' business would be disrupted.
Moreover, the Debtors might be delayed or unable to meet their
reporting obligations as debtors in possession operating under
chapter 11.

(e)  Foreign Vendors: The Debtors regularly transact business with
Foreign Vendors that provide goods and services.  The majority of
the Foreign Vendors are suppliers of customized whole goods and
are considered "critical" by the Debtors for the same reasons as the
domestic Critical Vendors that supply whole goods.  If the
prepetition claims of the Foreign Vendors are not paid, the Foreign
Vendors may take precipitous action against the Debtors based
upon an erroneous belief that they are not subject to the
jurisdiction of this Court and, thus, not subject to the automatic
stay provisions of 11 U.S.C. § 362(a).  The Foreign Vendors could,
among other things, sue in a foreign court and obtain a judgment
against the Debtors to collect prepetition amounts owed to them, or
immediately seek to attach or seize the Debtors' foreign assets
even prior to obtaining a judgment.  More importantly, the
Debtors' foreign suppliers could refuse to do business with the

- 34 -

> Debtors.  Given the Debtors' increasing reliance on the Foreign
> Vendors in order to reduce the cost of their products, the impact of
> such events on the Debtors' business would be catastrophic.

88.      I believe that the authorization to use resources for the payment of the

Critical Vendors is absolutely necessary to the Debtors' reorganization efforts.  The aggregate

cost of paying the Critical Vendors' prepetition claims is far less than the damage the Debtors

would suffer if the Critical Vendors were to terminate their relationships with the Debtors.

L.      DIP Financing, Cash Collateral, and Section 363 Re-Purchase

89.      The Debtors seek authority to enter into a debtor in possession financing

facility, use cash collateral, provide "adequate protection" to pre-petition lenders, schedule

interim and final hearings with respect to the relief requested in the motion, and to re-purchase

certain accounts receivable, all as more fully described in the motion.

90.      The Debtors intend to finance ongoing operations of their business during

their chapter 11 restructuring through a postpetition secured credit facility (the "DIP Facility") in

the amount of up to $99 million, comprised of a $24 million revolving credit line and a $75

million term loan, which will be provided by a group of lenders led by Black Diamond

Commercial Finance LLC, The CIT Group/Business Credit Group, and Morgan Stanley Senior

Funding.  The DIP Facility will not only provide the Debtors with much needed liquidity, but it

also will enable the Debtors to re-purchase accounts receivables sold pursuant to the Receivables

Purchase Agreement, permitting those receivables to serve as collateral for the DIP Facility, and

permit Werner Funding to satisfy all obligations owing under the A/R Securitization.

91.      The reasons supporting the Debtors' request for authority to obtain

postpetition financing under the DIP Facility and to use Cash Collateral are compelling.  As

explained in greater detail below, the DIP Facility will be used to re-purchase certain accounts

DB02:5358617.1                                                                                    065391.1001

receivable of Werner Co. that were sold pursuant to the Receivables Purchase Agreement, and to provide liquidity for working capital and other general corporate purposes of the Debtors subject to a monthly budget. The proposed DIP Facility will provide the Debtors with funds necessary for the operation of their business. In contrast, without the DIP Facility, the Debtors will be unable to fund their operations and their reorganization effort will fail even before it is able to get started. The Debtors also hereby seek authority to use Cash Collateral. Importantly, it is a condition to the DIP Lenders' obligation to lend that the Debtors receive authority to use Cash Collateral.

      (a)    <u>Cash Collateral</u>

      92.    During the ordinary course of operations, the Debtors generate cash from the use of the collateral pledged under the First Lien Credit Facility and the Second Lien Credit Facility ("Cash Collateral"). The Debtors use Cash Collateral in the normal course of their business in order to continue to finance their operations, make essential payments, such as employee payroll, taxes, and to purchase goods. As of the Petition Date, the Debtors have a cash balance of less than $3 million. It is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion as failure to do so could prevent the DIP Lenders from funding the DIP Facility. Thus, in order to obtain the much-needed funds under the DIP Credit Agreement, the Debtors require Court authority to use Cash Collateral.

      (b)    <u>Adequate Protection</u>

      93.    The Debtors and the DIP Lenders have agreed that the Prepetition Secured Parties and their respective agents (together, the "Prepetition Agents") should receive the following as adequate protection of their interests in the Prepetition Collateral, in an amount

- 36 -

equal to the aggregate diminution in value of the Prepetition Secured Parties' respective

Prepetition Collateral (collectively, the "Adequate Protection Obligations").

| Senior Pre-Petition Agent and First Lien Lenders | Adequate Protection Liens. A valid, perfected replacement security interest in and lien upon all Collateral, subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the security interests and liens granted to the DIP Agent for the benefit of the DIP Lenders in the Interim Order and pursuant to the DIP Documents and any liens on the Collateral to which such liens so granted to the DIP Agent are junior, and (iii) the Carve Out.

Section 507(b) Claim. Pursuant to section 507(b) of the Bankruptcy Code, subject and subordinate only to the payment of the Carve Out and the Superpriority Claims granted with respect to the DIP Obligations, the Adequate Protection Obligations shall constitute superpriority claims under section 364(c)(1) of the Bankruptcy Code. Notwithstanding the foregoing, the Senior Pre-Petition Agent and the First Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the Superpriority Claims under section 507(b) of the Bankruptcy Code granted pursuant to this Motion or under the Prepetition Secured Credit Documents, but excluding any amounts payable or paid pursuant to an order approving the Motion, unless and until the DIP Obligations have indefeasibly been paid in cash, in full.

Interest. The claims of holders of First Lien Credit Facility shall accrue and be allowed at the contractual rate (including the additional contractual default rate) set forth therein or in related documents, as applicable after an acceleration of the secured obligations under that facility, provided that the rights of all parties to contest whether the value of the Prepetition Collateral exceeds the Prepetition Secured Obligations (but not the rates) are hereby fully preserved.

Fees and Expenses. (i) in cash, all agent and letter of credit fees, in each case as and when due and payable pursuant to the terms of the First Lien Credit Documents; and (ii) current cash payments of all reasonable fees and expenses (including reasonable fees and disbursements of one lead and one local counsel and one financial advisor) incurred in connection with the monitoring of the Cases or the enforcement and protection of the rights and interests of the Senior Pre-Petition Agent and the First Lien Lenders in respect of the Adequate Protection |
|---|---|

| | Obligations, provided that the rights of any party to assert that any such amounts paid pursuant to clause (ii) should be applied to the reduction of principal under section 506(b) of the Bankruptcy Code are fully preserved. |
| --- | --- |

| | |
| --- | --- |
| **Junior Pre-Petition Agent and Second Lien Lenders** | Adequate Protection Liens.  A valid, perfected replacement security interest in and lien upon all Collateral, subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the security interests and liens granted to the DIP Agent for the benefit of the DIP Lenders in the Interim Order and pursuant to the DIP Credit Documents and any liens on the Collateral to which such liens so granted to the DIP Agent are junior; (iii) the Carve Out; and (iv) the Adequate Protection Liens granted to the First Lien Lenders and the Senior Pre-Petition Agent. |
| | Section 507(b) Claim.  Pursuant to section 507(b) of the Bankruptcy Code, subject and subordinate only to the payment of the Carve Out and the Superpriority Claims granted with respect to the DIP Obligations and the Superpriority Claims granted to the Senior Pre-Petition Agent and the First Lien Lenders, the Adequate Protection Obligations shall constitute superpriority claims under section 364(c)(1) of the Bankruptcy Code. Notwithstanding the foregoing, the Junior Pre-Petition Agent and the Second Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the Superpriority Claims under section 507(b) of the Bankruptcy Code granted pursuant to this Motion or under the Prepetition Secured Credit Documents, but excluding any amounts payable or paid pursuant to an order approving the Motion, unless and until the DIP Obligations have indefeasibly been paid in cash, in full. |
| | Interest.  The claims of holders of Second Lien Credit Facility shall accrue and be allowed at the contractual rate (including the additional contractual default rate) set forth therein or in related documents, as applicable after an acceleration of the secured obligations under that facility, provided that the rights of all parties to contest whether the value of the Prepetition Collateral exceeds the Prepetition Secured Obligations (but not the rates) are hereby fully preserved. |
| | Fees and Expenses.  Current cash payments of all reasonable fees and expenses (including reasonable fees and disbursements of one lead and one local counsel and one financial advisor) incurred in connection with the monitoring of the Cases or the |

- 38 -

| | enforcement and protection of the rights and interests of the Senior Pre-Petition Agent and the First Lien Lenders in respect of the Adequate Protection Obligations, provided that the rights of any party to assert that any such amounts paid should be applied to the reduction of principal under section 506(b) of the Bankruptcy Code are fully preserved. |
|---|---|

94.     The foregoing description takes into account the terms of the Intercreditor Agreement, which governs the rights and priorities of the Prepetition Secured Parties with respect to such adequate protection.  See Intercreditor Agreement § 6.01(b)(ii).

95.     The Debtors' proposed financial advisors and investment bankers, Rothschild Inc., expects to be able to testify at the Final Hearing that the value for the Debtors as an operating business based on management meeting its business plan for its future is in excess of the aggregate secured liens and claims pending against the Debtors.

(c)     Re-Purchase of Receivables

96.     The Debtors seek authority to enter into, and approval of, the Re-Purchase Agreement, which provides for the Debtors to re-purchase (the "Re-Purchase") accounts receivable sold to Werner Funding pursuant to the Receivables Purchase Agreement.  (A copy of the Re-Purchase Agreement in substantially final form is annexed to the Motion as Exhibit E.) The purchase price for the Receivables is expected to equal the outstanding amount of obligations owing by Werner Funding to CIT under the A/R Securitization as of the date of closing of the sale, plus a prepayment fee under the A/R Securitization of 1% of outstanding obligations thereunder.  The Debtors anticipate utilizing up to $50 million in proceeds from the DIP Facility (the "Re-Purchase Proceeds") to effectuate the Re-Purchase.  Werner Funding will, as part of the same transaction, utilize the Re-Purchase Proceeds to satisfy all outstanding obligations owed to CIT under the A/R Securitization.  Upon consummation of the Re-Purchase,

CIT will release its lien on the Receivables, which Receivables will become part of the collateral

securing the interests of the DIP Lenders under the DIP Credit Agreement, as well as the First

Lien Lenders and Second Lien Lenders. CIT will retain its lien on other assets (which does not

include the stock of Werner Funding) in accordance with the payoff letter to be entered into by

Werner Funding and CIT. Upon consummation of the Re-Purchase, Werner Funding will cease

purchasing Werner Co. receivables. The Re-Purchase should have no detrimental impact on

Werner Funding's creditors as Werner Funding likely has no creditors other than the Debtors.

> 97.    The Debtors believe the Re-Purchase is supported by sound business

judgment. Currently, there are no more borrowings available to the Debtors under the A/R

Securitization. The DIP Credit Agreement, by contrast, will provide the Debtors with much

needed incremental liquidity. As a condition to closing under the DIP Credit Agreement, the

Debtors are required to make the repurchased accounts receivable available, free and clear of any

other liens and claims, to secure the Debtors obligations thereunder. Thus, I believe it is crucial

to the Debtors' continued operations and potential reorganization that the Re-Purchase be

approved.

> 98.    In addition, I believe the transactions contemplated by the Re-Purchase are

undertaken by the Debtors in good faith, as that term is used in section 363(m) of the Bankruptcy

Code. There is no evidence of fraud or collusion in the terms of the Re-Purchase Agreement.

Moreover, the terms of that agreement do not benefit any insiders of the Debtors. For these

reasons, the Debtors respectfully submit that they have acted in good faith within the meaning of

section 363(m) of the Bankruptcy Code, and that neither the Debtors nor Werner Funding have

engaged in any conduct that would cause of permit the Re-Purchase to be avoided under section

363(n) of the Bankruptcy Code.

- 40 -

(d)    No Comparable Alternative to the DIP Facility if Currently Available

99.    The Debtors contacted 27 potential lenders, including 8 who are currently lenders in the Debtors' capital structure. The Debtors received 5 proposals. The Debtors determined based on this process that the proposed DIP Facility was the best offer received given, among other things, (x) the proposed DIP Lenders are among the First Lien Lenders, meaning that a portion of such lenders would consent to be primed, (y) the Second Lien Lenders cannot object because the proposed amount of the DIP Facility ($99 million) is below the threshold $100 million permitted under the Intercreditor Agreement, and (z) the interest rates, fees, and covenants were competitive with other proposals received. I believe the foregoing, in addition to evidence to be introduced at the hearing associated with the First Day Pleadings, will satisfy the requirement of sections 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

(e)    DIP Credit Agreement Terms are Fair, Reasonable, and Appropriate

100.    I believe the terms and conditions of the DIP Agreement are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. The proposed terms of the DIP Credit Agreement neither (a) tilt the conduct of these chapter 11 cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties-in-interest from being decided on their merits. The purpose of the DIP Credit Agreement is to enable the Debtors to meet ongoing operational expenses. Moreover, the proposed DIP Credit Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out.

(f)     Ordinary Course Hedging Arrangements Should Be Permitted to Continue

101.    The Debtors and their competitors routinely enter into hedging transactions (such as calls, puts, and options) with respect to aluminum prices when it makes good business sense to do so.  The Debtors often need to enter into such hedging transactions on a moment's notice, given the recent volatility in aluminum prices.  Subject to the limitations contained in the DIP Agreement, the Debtors intend to continue their hedging practices postpetition, and will utilize the DIP Facility to fund these transactions

(g)     Request for Modification of the Automatic Stay

102.    The proposed DIP Credit Agreement contemplates a modification of the automatic stay (to the extent applicable), to: (a) authorize, but not require, the lenders to file financing statements, deeds of trust, mortgages, or other similar documents to evidence, validate, and perfect the DIP Lenders' security interests granted to them under the DIP Credit Agreement; (b) give the Debtors any notice provided for in the DIP Credit Agreement; (c) execute upon their security interests or exercise other remedies under the Loan Documents upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), after giving five business days notice in writing, served by hand or telefax upon this Court, Debtors' counsel, any trustee of the Debtors, if appointed, counsel for any official creditors' committee, counsel for the Prepetition Agent, and the Office of the United States Trustee; and (d) take such other actions required or permitted by the Loan Documents.  I believe the stay modification provisions are reasonable under the present circumstances.

103.    I believe that the relief requested in this motion is necessary to the Debtors' reorganization efforts, and that absent such relief, the Debtors' reorganizations efforts would fail before even getting started.

- 42 -

3199538

## CONCLUSION

Accordingly, for the reasons stated herein and in each of the First Day Pleadings,

the Debtors request that the relief sought in the First Day Pleadings be approved.

Dated: Wilmington, Delaware
       June *12*, 2006

WERNER HOLDING CO. (DE), INC., *et al.*

_____
Larry V. Friend
Vice President, Chief Financial Officer, and Treasurer