**IN UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OLD LADDER CO. (DE), INC., *et al.*,<br><br>Debtor. | Chapter 11<br><br>Case No. 06-10578 (KJC)<br>Jointly Administered |

**FINAL APPLICATION OF ROTHSCHILD INC. FOR**
**COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Name of Applicant: **Rothschild Inc.**

Authorized to Provide Professional Services to: **OLD LADDER CO (DE) INC. et al.**

Date of Retention: **August 11, 2006 (nunc pro tunc to June 12, 2006)**

Period for which compensation and reimbursement are sought: **June 12, 2006 – June 8, 2007**

Amount of compensation sought as actual, reasonable, and necessary: **$3,711,008.20**

Amount of expense reimbursement sought as actual, reasonable, and necessary: **$513,085.30**

This is a: _____ Monthly _____ Interim __X__ Final Application

If this is not the first application filed, disclose the following for prior application:

| Date Filed | Period Covered | Requested Fees | Requested Expenses | Approved Fees | Approved Expenses |
|---|---|---|---|---|---|
| 9/28/06 | 6/12/06 – 8/31/06 | $1,385,000.00 | $21,879.11 | $1,135,000.00 | $19,042.16 |
| 11/2/06 | 9/1/06 – 9/30/06 | 150,000.00 | 27,468.47 | 150,000.00 | 27,468.47 |
| 12/13/06 | 10/1/06 –10/31/06 | 150,000.00 | 38,169.70 | 150,000.00 | 38,169.70 |
| 1/12/07 | 11/1/06 –11/30/06 | 150,000.00 | 24,087.07 | 150,000.00 | 24,087.07 |
| 2/13/07 | 12/1/06 –12/31/06 | 150,000.00 | 45,075.90 | 150,000.00 | 37,223.61 |
| 5/15/07 | 1/1/07 – 1/31/07 | 150,000.00 | 24,373.36 | 150,000.00 | 24,373.36 |
| 5/15/07 | 2/1/07 – 2/28/07 | 150,000.00 | 10,975.90 | 150,000.00 | 10,975.90 |
| 5/15/07 | 3/1/07 – 3/31/07 | 150,000.00 | 105,381.83 | 150,000.00 | 105,381.83 |
| 8/16/07 | 4/1/07 – 6/8/07 | 340,000.00 | 226,363.20 | 0.00 | 0.00 |
| 10/9/07 | 6/12/06 – 6/8/07 | 1,186,008.20 | 0.00 | 0.00 | 0.00 |

316736

**IN UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>OLD LADDER CO. (DE), INC., *et al.*,<br><br>               Debtor. | Chapter 11<br><br>Case No. 06-10578 (KJC)<br>Jointly Administered |

**FINAL APPLICATION OF ROTHSCHILD INC. FOR**
**COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Rothschild Inc. ("Applicant"), financial adviser and investment banker for Old Ladder Co. (DE), Inc. ("Debtor"), makes this final application for compensation and reimbursement of expenses and in support thereof respectfully represents:

1.    This application is made pursuant to (i) Sections 327(a), 328(a) and 105(a) of Title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rule 2014 of the Federal Rules of Bankruptcy Procedure, (iii) the Administrative Order of this Court, dated June 13, 2006, Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedure for Interim Compensation and Reimbursement of Expenses for Professionals (the "Fee Procedures Order") and (iv) the Order of this Court, dated August 11, 2006 Authorizing the Debtor to Employ Rothschild Inc. as Financial Advisor and Investment Banker Pursuant to 11 U.S.C. § 327(a), 328(a) and 105(a) (the "Retention Order"), a copy of which is attached hereto as Exhibit A.  Pursuant to the Retention Order, the Debtor were authorized to employ and retain Applicant pursuant to the terms of a letter agreement, dated as of January 23, 2006 (the "Engagement Letter") a copy of which is attached as Exhibit B, between the Debtor and Applicant, subject to certain modifications. Under the Engagement Letter, Applicant is entitled, among other things, to payment of various

316736

transaction fees, including an M&A Fee, as defined in the Engagement Letter, as well as a monthly cash advisory fee (subject to defined credits) and a reimbursement of Applicant's expenses, including those expenses related to the Indemnification provision of the Engagement Letter.

2.    Under the Second DIP Forbearance Agreement, the Applicant agreed to a carve-out governing the payment of professional fees. Such carve-out liabilities were assumed by New Werner Holding Co. in connection with the Sale. However, the Second DIP Forbearance Agreement did not modify the Applicant's Engagement Letter, resulting in the Debtor being responsible for any unassumed liabilities. The Applicant would have been entitled to an M&A Fee equal to $3,576,371.04 based on the total aggregate consideration of the Sale multiplied by the applicable rate under the Engagement Letter. Under the Second DIP Forbearance Applicant was allowed total compensation with regards to the M&A Fee from the Sale of $1,500,000 plus post acquisition expenses. The Applicant has reached an agreement on a stipulation (the "Stipulation"), attached hereto as Exhibit E, between the Debtor, New Werner Holding Co., Levine Leichtman Capital Partners and the Official Committee of Unsecured Creditors (the "OCUC") regarding the treatment of the Applicant's M&A Fee and expenses incurred, as order by this Court on October 25, 2007. Under the Stipulation, each party to Stipulation agreed to withdraw its respective objections to the Applicant's Ninth Fee Application and refrain from filing any objection, to any monthly, interim and / or final applications for allowance of professional fees and expense reimbursements of the Applicant. The parties to the Stipulation have also agreed to fully and completely release each party from all claims, known or unknown, arising in any way in connection with the Applicant's Engagement Letter or the financial advisory / investment banking relationship between the Applicant and the Debtor, including

claims arising prior to June 8, 2007 and the Chapter 11 cases, including Trust Funding, the

Additional Funding, or the Causes of Action as defined in the Liquidating Plan. The Applicant

has also agreed to waive any objections to the Liquidating Plan and will withdraw its Motion for

Protective Order for discovery in relation to the subpoena served by LLCP and will provide all

relevant documents in relation to the discovery and will waive its right to claims or causes of

action with respect to fees it may be entitled to in the future. In exchange for the above releases,

the Applicant has agreed to accept a reduced M&A Fee in the amount of $1,500,000.00 and

expense reimbursement of $150,000.00 for expenses incurred by Applicant after June 12, 2007.

The Applicant applied for compensation with regards to the M&A Fee in an Interim Application

filed October 9, 2007 and is hereby submitting this Final Application for compensation and

reimbursement of expenses.

3.      By this Application, and pursuant to the Fee Procedures Order and Stipulation,

Applicant seeks final approval of compensation accrued under the Engagement Letter during the

period June 12, 2006 through June 8, 2007 (the "Relevant Period"), consisting of (i) fees in the

amount of $3,711,008.20 and (ii) reimbursement of reasonable and necessary expenses incurred

by Applicant during the Relevant Period in the amount of $513,085.30 for a total payment

amount of $4,224,093.50.

4.      On or about January 23, 2006, after interviewing several investment banking firms,

Debtor engaged Applicant to advise the Debtor with respect to their financial restructuring.

Pursuant to the Retention Order, Applicant has continued to provide financial advisory and

investment banking services to the Debtor during the pendency of these Chapter 11 cases. The

Debtor chose to retain Applicant, among other reasons, because of Applicant's reputation as a

leading investment banking firm and financial advisor and its substantial experience advising

debtors, creditors' committees and other parties in interest in connection with all aspects of financial restructurings and Chapter 11 cases, including financial advice regarding mergers, acquisitions, divestitures, public and private financings and spin-offs and evaluation of assets and liabilities, formulation and negotiation of plans of reorganization and the restructuring of indebtedness.

5.     On August 11, 2006, this Court entered the Retention Order, pursuant to Bankruptcy Code Sections 327(a), 328(a) and 105(a) as supplemented by Bankruptcy Rules 2014 and 2014-1. The Retention Order stipulates that Applicant's fees and expenses shall be subject to review solely under the standard of review under section 328(a) of the Bankruptcy Code. Notwithstanding, the U.S. Trustee retained the right to object to the Restructuring and M&A Fee on all grounds, including, but not limited to, the reasonableness standard provided for in Section 330 of the Bankruptcy Code provided reasonableness would not be evaluated on an hourly or length of case basis. The Applicant's expenses are also subject to examination by a Court appointed fee auditor.

6.     By the Retention Order, this Court has approved the appointment of Applicant as investment banker and financial advisor to the Debtor to provide assistance to the Debtor in evaluating the complex financial and economic issues raised by these Chapter 11 cases and to fulfill their statutory and fiduciary duties. As more fully described in the Engagement Letter, Applicant was retained by the Debtor to:

(a) to the extent deemed desirable by the Company, identify and/or initiate potential Transactions;[1]

---

[1] As defined in the Engagement Letter, attached as Exhibit B

(b)  to the extent Rothschild deems necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and the operating and financial strategies of the Company;

(c)  review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

(d)  evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company;

(e)  assist the Company and its other professionals in reviewing the terms of any proposed Transaction, in responding thereto and, if directed, in evaluating alternative proposals for a Transaction, whether in connection with a Plan (as defined below) or otherwise;

(f)  determine a range of values for the Company and any securities that the Company offers or proposes to offer in connection with a Transaction;

(g)  advise the Company on the risks and benefits of considering a Transaction with respect to the Company's intermediate and long-term business prospects and strategic alternatives to maximize the business enterprise value of the Company, whether pursuant to a Plan or otherwise;

(h)  review and analyze any proposals the Company receives from third parties in connection with a Transaction, as appropriate;

(i)  assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Company and/or their respective representatives in connection with a Transaction;

(j)  advise and attend meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as necessary;

(k)  to the extent requested by the Company, assist the Company in raising equity, debt and/or hybrid capital and/or refinancing or amending any of its existing debt facilities;

(l)  with respect to any 3(a)(9) Offer, subject to the exemption from registration provided by Section 3(a)(9) of the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "Securities Act"), Rothschild and the Company shall, in consultation with their respective counsel establish guidelines regarding the scope and execution of Rothschild's services hereunder with respect to any 3(a)(9) Offer;

(m)  participate in hearings before the Bankruptcy Court and provide relevant testimony with respect to the matters described herein and issues arising in connection with any proposed Plan; and

(n)  render such other financial advisory and investment banking services as may be agreed upon by Rothschild and the Company in connection with any of the foregoing.

7.    A copy of the Engagement Letter and the resumes of key professionals of Applicant providing services to the Debtor are attached as Exhibits A and B, respectively.

8.    Senior level professionals with extensive experience in the area of investment banking and bankruptcy services have directed Applicant's team.  The investment banking services set forth above were performed primarily by Neil A. Augustine, Managing Director, Bernard Douton, Director, Carlos Orellana, Associate, and Brett Adamczyk, Analyst, as well as other professionals and paraprofessionals, as needed.  Applicant's general staffing policy is to

assign senior bankers, experienced junior bankers, associates and financial analysts to each restructuring assignment. The senior banker, Neil Augustine, has overall responsibility for the case. He is primarily responsible for developing strategy with respect to the case, directing negotiations and interfacing with the other senior professionals involved with the case. The additional senior banker, in this case Bernard Douton, is responsible for day-to-day coordination of the case and the review of all financial analyses. The experienced junior banker, in this case Carlos Orellana, guides the financial analyses and works closely with the financial analyst, in this case Brett Adamczyk, who assists in the day-to-day coordination of the case and performs extensive financial analyses. The senior bankers, experienced junior banker and financial analyst coordinate their actions so as to not duplicate efforts. Given that the senior bankers, the experienced junior banker and the financial analyst have different roles in the case but have overlapping responsibilities, there are frequent times where it is appropriate for two or more bankers to be present at a meeting.

9.    The amount of fees and expenses sought in this application and Applicant's billing processes are consistent with market practices for investment banking firms both in and out of bankruptcy. Applicant does not bill its clients based on the number of hours expended by its professionals. It bills clients on a retainer basis (generally monthly), plus transaction fees. Accordingly, Applicant does not have hourly rates for its professionals and Applicant's professionals generally do not maintain time records for the work performed for its clients. Applicant's policy, for all engagements in or out of bankruptcy, is to dedicate the appropriate number of professionals to the assignment to complete the work as efficiently as possible. Applicant has, however, maintained a daily time log detailing the activities and services performed by Applicant on behalf of the Debtor during the Relevant Period. These records,

which have been provided in conjunction with the filing of the Applicant's monthly fee applications, describe the time expended by each professional and paraprofessional for this period.

10.    Given the size and complexity of this case, the complicated corporate and financial structure of the Debtor, the degree of activity during the Relevant Period and the high level of services rendered by Applicant to the Debtor, Applicant believes that the compensation sought is fair and reasonable.

## SUMMARY OF MONTHLY FEE APPLICATIONS

11.    Pursuant to the terms of the Fee Orders Procedure, Rothschild has submitted monthly statements of fees and disbursements to (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel to all official committees, (iv) and the Office of the United States Trustee.  The monthly and interim fee applications delivered by Rothschild during the Relevant Period, and amounts received in respect thereof, are summarized in the following table:

| Period Covered | Requested Fees | Requested Expenses | Approved Fees | Approved Expenses | Amount Outstanding |
|---|---|---|---|---|---|
| 6/12/06 – 8/31/06 | $1,385,000.00 | $21,879.11 | $1,135,000.00 | $19,042.16 | 0.00 |
| 9/1/06 – 9/30/06 | 150,000.00 | 27,468.47 | 150,000.00 | 27,468.47 | 0.00 |
| 10/1/06 –10/31/06 | 150,000.00 | 38,169.70 | 150,000.00 | 38,169.70 | 0.00 |
| 11/1/06 –11/30/06 | 150,000.00 | 24,087.07 | 150,000.00 | 24,087.07 | 0.00 |
| 12/1/06 –12/31/06 | 150,000.00 | 45,075.90 | 150,000.00 | 37,223.61 | 0.00 |
| 1/1/07 – 1/31/07 | 150,000.00 | 24,373.36 | 150,000.00 | 24,373.36 | 0.00 |
| 2/1/07 – 2/28/07 | 150,000.00 | 10,975.90 | 150,000.00 | 10,975.90 | 0.00 |
| 3/1/07 – 3/31/07 | 150,000.00 | 105,381.83 | 150,000.00 | 105,381.83 | 0.00 |
| 4/1/07 – 6/8/07 | 340,000.00 | 226,363.20 | 0.00 | 0.00 | 566,363.20 |
| 6/12/06 – 6/8/07 | 1,186,008.20 | 0.00 | 0.00 | 0.00 | 1,186,008.20 |
| **Total** | **$3,961,008.20** | **$523,774.54** | **$2,185,000,00** | **$286,722.10** | **$1,752,371.40** |

## BACKGROUND

12.    On June 12, 2006, the Debtor filed voluntary petitions in the Court under Chapter 11 of the Bankruptcy Code.  Werner Co., the principal operating Debtor, is a wholly owned subsidiary of Werner Holding Co. (DE), Inc. ("Werner DE"), a Delaware corporation, which, in turn, is a wholly owned subsidiary of a Pennsylvania corporation, Werner Holding Co. (PA), Inc. ("Werner PA").  Neither Werner PA nor Werner DE has substantial operations, nor do they own assets other than their investments in Werner DE and Werner Co., respectively.

13.    During the Relevant Period, the Debtor was the nation's largest manufacturer and marketer of ladders and other climbing products, producing five principal categories of climbing equipment: (i) single and twin stepladders; (ii) extension, fixed and multipurpose ladders; (iii) attic ladders; (iv) stages, planks, work platforms and scaffolds; and (v) assorted climbing product accessories.  The majority of the Debtor's climbing product sales are of either aluminum or fiberglass ladders.

14.    During the Relevant Period, the Debtor was in possession of their properties and continued to operate and manage their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

15.    The Debtor obtained a $99 million facility from Black Diamond Commercial Finance, LLC ("BDCF") after receiving proposals from potential lenders.  Interim approval for this facility was obtained during the first day hearings with final approval on July 25, 2006.

16.  As a result of the Chapter 11 filing and loss of key executive management personnel, the Debtor implemented various business related programs, including the Business

Optimization Bonus ('BOB") and Chicago Transition Bonus ("CTB") programs as well as terminating the its supplemental executive retirement plan ("SERP").

17.    Beginning January 1, 2007 the Debtor was in default under its DIP Facility. Prior to the actual default, the Debtor and Black Diamond initiated negotiations with respect to a DIP forbearance agreement (the "Original DIP Forbearance Agreement"), which was entered into on January 5, 2007.

18.    After entering into the Original DIP Forbearance Agreement the Debtor began planning to exit Chapter 11, either through a sale of its assets or a consensual plan of reorganization. As part of this process, the Debtor revised its 2007 budget and developed a long-term business plan. The Debtor also prepared materials for a potential sale, including a confidential information memorandum, while attempting to negotiate a consensual plan.

19.    On January 18, 2007, an investor group (the "Second Lien Investor Group") consisting of lenders under the second priority credit agreement, dated May 10, 2005 (the "Second Lien Credit Facility"), submitted an unsolicited offer to purchase substantially all of the Debtor's assets for approximately $175.0 million. While the Debtor and Applicant were in negotiations with the Second Lien Investor Group regarding the terms of its proposal, the Debtor also received an unsolicited offer from another investor group (the "First Lien Investor Group"), consisting of lenders under the first priority credit agreement, dated June 11, 2003 (the "First Lien Credit Facility"). The Debtor and Applicant completed an analysis of each proposal and held negotiations with both the Second Lien Investor Group and the First Lien Investor Group (together the "Preliminary Bidders") and on February 1, 2007 the Debtor entered into a non-binding term sheet with the First Lien Investor Group regarding the Sale.

316736

20.    In order to proceed with the Sale without derailing the negotiations and in the face of certain potential defaults under the Debtors' $99 million debtor in possession financing facility (the "DIP Facility"), the Debtor entered into a second forbearance (the "Second DIP Forbearance Agreement") with the lenders under the DIP Facility (the "DIP Lenders"), dated as of January 29, 2007, as amended by that certain Amendment to the Second Forbearance Agreement dated as of March 21, 2007 (the "Second DIP Forbearance Amendment").   The Second DIP Forbearance Agreement provided that the DIP Lenders would conditionally waive any breaches, violations and defaults arising from the failure of the Debtor to comply with the financial covenants in the DIP Facility through May 7, 2007. The Second DIP Forbearance Agreement was also conditioned upon the Debtors' ability to meet certain milestone events, including the sale of substantially all of the Debtor's assets by May 7, 2007 (subject to certain extensions). As required by the Second DIP Forbearance Agreement, on February 15, 2007, the Debtor filed a motion (i) seeking approval of bidding procedures (the "Bidding Procedures") in connection with the Sale, including a break-up fee and expense reimbursement; (ii) establishing procedures to determine cure amounts and deadlines for objections for certain contracts and leases to be assumed and assigned by the Debtors and (iii) granting related relief.

21.    Pursuant to the Second Forbearance Agreement, Applicant also agreed to an amendment of the carve-out provided by the DIP Lenders under Section 1930 of the Bankruptcy Code.    The Second Forbearance Agreement, however, did not modify the Applicant's Engagement Letter and its entitlement to the full M&A Fee earned for consummating a Sale.

22.    On February 6, 2007, the Second Lien Investor Group increased its initial offer and filed a proposed asset purchase agreement with the Court. Thereafter, the Debtor negotiated comprehensive asset purchase agreements with both the Second Lien Investor Group and the

First Lien Investor Group. The offers that were initially delivered to the Debtors by the Preliminary Bidders (the "Preliminary Bids") were conditioned on additional due diligence, receipt of requisite financing and other significant contingencies.

23.    During the month of March, the Debtor and Applicant afforded each of the Preliminary Bidders the opportunity to conduct substantial due diligence while also negotiating the terms of the Sale.  The Applicant arranged each aspect of the due diligence process and fully cooperated with the Preliminary Bidders diligence requests throughout the process.  The Debtor was of the view that it was in its best interests to receive an offer that was free of due diligence or financing conditions.  During the course of the negotiations with the Preliminary Bidders, the Debtor requested that each Preliminary Bidder "go firm" by March 19, 2007, and each of the Preliminary Bidders indicated their willingness to meet this deadline.  Accordingly, the Debtor elected not to press forward to obtain a Bidding Procedures order by March 7, 2007, as originally required by the Second Forbearance Agreement.  Instead, on March 9, 2007, the Debtor filed a motion seeking approval of the Second DIP Forbearance Amendment, which was conditioned upon, among other things, the Debtor selecting, documenting and entering into an asset purchase agreement by March 19, 2007, to the extent available, with the highest or otherwise best offer for the purchase of substantially all of the Debtor's assets that was not subject to financing or due diligence contingencies.  On March 19, 2007, the Debtors, with approval of their Boards of Directors, entered into the Purchase Agreement with the First Lien Investor Group.

24.    As a result of the Debtor's extensive negotiations with the Preliminary Bidders and the Debtor's and Applicant's analysis of the offers of the Second Lien Investor Group and the First Lien Investor Group, the Debtor was able to enter into a purchase agreement with the First Lien Investor Group for a purchase price consisting of (i) cash sufficient to pay the DIP

(including letters of credit) and fund a wind down budget for the Debtor's estate (the "Wind Down Budget") and (ii) the assumption by the buyer of the Assumed Liabilities, valued at approximately $37 million, subject to higher or otherwise better offers, and that provided for, among other things, the Buyer to serve as a stalking horse and receive certain bidding protections in connection therewith. The Purchase Agreement submitted by the First Lien Investor Group represented a substantially better offer than those originally proposed by the either of the Preliminary Bidders. The total purchase price for substantially all of the Debtor's assets increased over the original purchase offers by more than $70 million dollars. The First Lien Investor Group also demonstrated the ability to enter into an agreement with limited conditions to the closing of the Sale.

25. On March 19, 2007, the Debtor filed the form of the purchase agreement (the "Purchase Agreement"). A hearing on the Sale Procedures Motion and the Second DIP Forbearance Amendment was held before the Court on March 20, 2007 (the "Sale Procedures Hearing"). On March 22, 2007, the Debtor filed revised copies of the proposed Sale Procedures Order (as defined below), the Auction and Sale Notice, and the Bidding Procedures. On March 23, 2007, the Court entered two orders. The first order approved the Sale Procedures Motion and authorized the Debtors to pay the expense reimbursement to the stalking horse ("Stalking Horse") on the terms and conditions set forth in the Purchase Agreement (the "Sale Procedures Order"). The second order approved the Second DIP Forbearance Amendment.

26. Pursuant to the Court's entry of the Purchase Agreement, the Debtor and Applicant filed amended Bidding Procedures shortening the bid deadline from April 23rd to April 20th, modifying the auction date from May 1st to April 23rd and also moving the sale hearing from May 7th to April 25th.

27.  The Debtor, with considerable help from the Applicant, actively marketed the Debtor's assets and pursuant to the Bidding Procedures provided notice of the sale to each entity that expressed a bona fide interest in the assets on March 27, 2007.  Beginning in February 2006, Applicant conducted a third-party bid solicitation process through which Applicant contacted more than 190 potential strategic and financial buyers regarding their interest in acquiring the Debtor's assets.  Applicant distributed and negotiated confidentiality agreements with more than 60 potential buyers who expressed an interest in the process.  Applicant also distributed copies of the confidential information memorandum to the 27 potential buyers that executed a confidentiality agreement satisfactory to the Debtor.  All creditors, equity holders, other parties-in-interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the assets.

28.  During the month of April, the Debtor and Applicant coordinated the necessary due diligence for the First Lien Investor Group with respect to closing the Sale and securing financing to fund the transaction.  Debtor and Applicant worked closing with the First Lien Investor Group to negotiate outstanding items in the Purchase Agreement as well as with the First Lien Investor Group and their advisors regarding open items to satisfy financing contingencies. The Debtor and Applicant were also in constant contact with the Second Lien Investor Group to further their diligence efforts and remove any and all potential conditions to their offer.

29.  Prior to the bid deadline, the First and Second Lien Investor Groups, as well as members of the OCUC, informed the Debtor that they were in discussions regarding a consensual agreement among the parties to purchase the Debtor's assets.  Debtor and Applicant sought an extension of the deadline for submitting bids on two occasions to accommodate the settlement discussions among the groups.  The initial request allowed for the bid submission deadline to be

moved from April 20th to April 23rd at 10:00 a.m. with a subsequent request to move the deadline to further in the afternoon on April 23rd. During this time, Applicant participated in numerous negotiations between the parties. On April 23rd the Debtor, with approval from its Board of Directors, reached a consensual deal for the purchase of substantially all of its assets for total consideration of $270,937,200 with the First Lien Investor Group, Second Lien Investor Group and OCUC. The purchase price under the consensual agreement was higher than that submitted on a stand alone basis by the First Lien Investor Group.

30. On April 25, 2007, this Court entered an order approving the sale of substantially all of the Debtor's assets free and clear of liens, claims, interests and encumbrances (the "Sale Order") to a group consisting of certain creditor constituents of the Debtor including Black Diamond Capital Management, LLC, Trust Company of the West, Brencourt Advisors, Schultze Asset Management, Milk Street Advisors and Levine Leichtman Capital Partners for total consideration of $270,937,200.00, including the assumption of certain of the Debtor's liabilities. The total consideration consisted of $91,782,800 million of cash, $40,642,400 million of assumed obligations, a $132,500,000 million credit bid of the Debtor's First Lien debt and $5,000,000 million cash bid from the Debtor's Second Lien holders along with the establishment of a litigation trust for the OCUC and future claims. In conjunction with the Sale Order this Court also entered orders approving the Purchase Agreement and the assumption and assignment of certain contracts and leases.

31. On June 8, 2007, the First Lien Investor Group, Second Lien Investor Group and OCUC closed on the purchase of substantially all of the Debtor's assets pursuant to the terms of the Purchase Agreement.

32.   On June 19, 2007 the Official Committee of Unsecured Creditors of the Debtor filed a disclosure statement (the "Disclosure Statement") and plan of reorganization (the "POR). The Disclosure Statement and POR outline the necessary provisions for the wind down of the estate and the establishment of and guidelines for a liquidation trust for members of the Official Committee of Unsecured Creditors.   Union Central Life Insurance Company, Grand Central Asset Management and the Applicant objected to the Disclosure Statement.

33.   On July 18, the OCUC filed a motion to convert the Debtor's Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code, filing The Liquidating Plan (the "Plan") and its accompanying Disclosure Statement to complete the liquidation of the Debtor's assets and distribute all the proceeds.

34.   On August 23, 2007, the OCUC filed a Second Amended Liquidating Plan and Disclosure Statement.

35.   On September 14, 2007 the Court approved the Disclosure Statement with respect to the Second Amended filed by the OCUC pursuant to section 1125 of the Bankruptcy Code and set an October 15, 2007 deadline for voting on the Second Amended Liquidating Plan.

36.   The Second Amended Liquidating Plan and Disclosure Statement were confirmed on October 25, 2007.

## SUMMARY OF SERVICES RENDERED

A.   Operating and Financial Review

37.   Applicant's financial and operating due diligence involved numerous meetings and telephone calls with officers of Debtor.  The subjects reviewed on these occasions included the

operating structure and financial results of the Debtor, financial reporting structure, legal and tax structure of the Debtor and their subsidiaries and numerous other subjects. Prior to and during the Relevant Period, Applicant has reviewed the status of the Debtor's operational restructuring plan and advised management with respect to its implications in the context of a financial restructuring. Applicant also monitored the Debtor's performance on a regular basis and reviewed the Debtor's monthly reporting packages, key performance indicator reports, weekly 13-week cash flow forecast, customer fill rate reports and other daily/weekly/monthly management reports. Applicant has closely monitored the Debtor's liquidity situation and has assisted management in evaluating its future liquidity requirements.

B.    Financial Analysis and Due Diligence

38.    Applicant reviewed and performed various analyses of the Debtor's financial and operational performance, liquidity situation, capital structure and the potential financial implications of various scenarios. Applicant's review involved the analysis of the Debtor's historical financial performance as well as discussions with the Debtor's management. In addition to analysis of the Debtor's historical performance, the Applicant also performed analysis with regards to the Debtor's current and anticipated tax position and product liability claims. In conjunction with the budgeting process, described in detail in the following section, the Applicant also built a recapitalization model to aid in the analysis of potential exit options and financing proposals. The Applicant also began developing a going-concern valuation of the Debtor by compiling a list of comparable companies and their trading multiples and searching for relevant recent precedent transactions in the home building materials and hardware and tools industries. Applicant has reviewed and performed various analyses of the Debtor's DIP Budget, liquidity situation, capital structure and the potential financial implication of various scenarios.

Applicant's review involved the analysis of the Debtor's historical financial performance and the Debtor's DIP Budget, as well as discussions with the Debtor's management.

C.    Debtor advisor planning

39.    Applicant participated in numerous meetings and calls with the Debtor, Willkie Farr & Gallagher LLP ("Willkie") and other advisors to the Debtor to discuss strategic and other issues relating to the Chapter 11 process and operations. Applicant lead conference calls on a regular basis with Debtor's management and advisors to discuss various business, legal, operational restructuring and Chapter 11 matters. Applicant has monitored the Debtor's operational restructuring and transition to Juarez, Mexico and has advised management with the implications of this transition with respect to the financial restructuring and the Chapter 11 process.

D.    Chapter 11 issues

40.    Applicant participated in numerous calls and discussions with respect to the Chapter 11 process, assisted Willkie in the preparation of documentation and pleadings in connection with the Chapter 11 process, conducted a process to obtain DIP financing for the Debtor (defined and described in detail later in this section), gave testimony with respect to the Debtor's DIP financing facility, BOB and CTB programs, bidding procedures and the sale hearing, assisted the Debtor in retaining a communications professional and in developing a comprehensive communications program with employees, vendors and customers.

E.    DIP Financing Process

41.    Applicant reviewed the Debtor's ability to obtain DIP financing based on their
unencumbered assets and identified over 25 parties potentially interested in providing such DIP
financing. Applicant contacted such parties, executed confidentiality agreements, provided
diligence information and responded to questions from potential DIP lenders. Applicant
solicited, received and evaluated various proposals from potential lenders and provided continual
updates to Debtor's management, advisors and Board of Directors on the potential alternatives
for raising DIP financing for the Debtor. After Black Diamond Commercial Finance, LLC
("BDCF") was selected by the Debtor as DIP lender, Applicant participated in negotiating the
DIP financing credit agreement with BDCF. Given the level of interest expressed by the market
at the time and at the request of the holders of the Debtor's second lien debt, Applicant led a
subsequent process after the Interim DIP Approval to potentially replace BDCF as DIP lender to
obtain better terms for the Debtor. Applicant solicited, received and evaluated proposals from
potential lenders and provided recommendations to Debtor's management and Board of
Directors. In connection with the process, Applicant engaged in substantive discussions with
Werner's DIP and second lien lenders during which detailed analyses of the advantages and
disadvantages of the competing proposals were reviewed and discussed. Applicant negotiated a
compromise between the two lender groups regarding amendments to the BDCF DIP that
improved upon the original terms of the DIP at a lower cost to the estate than would have been
the case if the BDCF DIP was replaced. The amended DIP provided the Debtor with additional
financial flexibility in the form of amended covenants.

42.    With respect to the DIP facility, Applicant prepared a presentation for certain credit
rating agencies, participated in a meeting with the credit rating agencies and assisted the Debtor

in facilitating information requested by the credit rating agencies for their evaluation of the DIP facility.

F.    BOB and CTB programs

43.    Applicant assisted the Debtor in obtaining support of the BOB and CTB programs from the Debtor's various creditor constituencies by participating in numerous meetings and conference calls, preparing presentations detailing and explaining the programs, and assisting the various creditor constituencies in their due diligence of the programs.  Applicant worked with management to prepare and evaluate the financial impact of terminating the Debtor's SERP. Applicant presented an analysis and a recommendation to the Board with respect to the SERP, which led to its approval of the termination of the plan.  Additionally, Applicant participated in numerous calls with management, the Board and the Debtor's advisors to develop a comprehensive incentive package.  Applicant also assisted in communicating and seeking the support of the various creditor constituencies with respect to this incentive package.  Applicant met with Mercer Consulting ("Mercer") and other of the Debtor's advisors to discuss the Debtor's incentive strategy going forward and the respective implications and testified to these conclusions in Court.  Applicant also participated in calls with management and the Debtor's advisors to discuss alternatives with respect to the Debtor's pension plan upon emergence from Chapter 11.

G.    Creditors Meetings, Discussions and Due Diligence

44.    Applicant participated in numerous meetings and conference calls with interested parties in these cases, including the Debtor's pre- and post-petition lenders and their respective advisers and members of and advisers to the DIP lenders, first lien lenders, Ad Hoc Committee

of Second Lien lenders and the OCUC to report and respond to questions concerning the Debtor's current liquidity, strategic business plan, operational restructuring, financial forecast, exit strategy and other matters relating to the Chapter 11 process.

45.    Applicant also participated in numerous site visits and meetings at the Debtor's Juarez, Chicago and Merced facilities with interested parties in these cases, including the Debtor's pre- and post-petition lenders and their respective advisers and advisers of the OCUC.

46.    Applicant worked together with management and the Debtor's other advisors in reviewing and responding to a due diligence request list submitted by the OCUC consisting of nearly 300 financial, legal and operational items as well as due diligence requests from Werner's other stakeholders.  Applicant coordinated the collective effort of providing the information requested, prepared documents to respond to certain items and participated in meetings and conference calls with management to answer certain questions included in the due diligence request list mentioned above.

47.    Applicant coordinated and worked with management and the other advisors of the Debtor to respond to all of the lenders and OCUC's due diligence requests.  Applicant held numerous meetings and conference calls to review, discuss and answer all diligence requests of the lenders and OCUC, including the preparation of a 133-page presentation to the OCUC and its advisors in response to their initial due diligence request and subsequent meeting in Pittsburgh. Applicant also participated in meetings with the OCUC to discuss the Chapter 11 proceedings in December 2006 in New York and to present the Debtor's long-term business plan in February 2007.

H.     DIP covenant violation

48.    Applicant worked with management and the Debtor's other advisors in connection with the Debtor's default under its DIP Facility. Applicant and the Debtor's other advisors were in constant dialogue with the Debtor's various creditor constituencies attempting to negotiate a forbearance agreement, evaluating potential sources of replacement DIP facility and providing updates with respect to the situation. Applicant evaluated the Debtor's funding needs based on management's outlook on the future performance of the business, and Applicant contacted certain third parties requesting proposals with respect to a replacement DIP facility. Applicant analyzed, evaluated and discussed with management the responses received in the context of this request.

I.     Consummation of Sale Process

49.    Beginning in December 2007 the Debtor notified the Applicant of potential defaults on certain financial covenants with respect to the Debtor's DIP Agreement. Applicant and the Debtor's other advisors held numerous meetings and conference calls with Black Diamond as DIP Agent regarding possible alternatives to address the Debtor's DIP default. During these discussions, Black Diamond expressed interest in pursuing exiting Chapter 11 through the sale of the Debtor. The Applicant and Debtor's other advisors began preparations for the consummation of a sale process or a Chapter 11 plan, as well as negotiations for waivers of the covenant defaults with Black Diamond.

J.     DIP Forbearance

50.    Beginning January 1, 2007 the Debtor was in default under its DIP Facility. Applicant and the Debtor's other advisors had numerous meetings and conference calls with

Black Diamond as DIP Agent regarding possible alternatives to address the Debtor's DIP default. Prior to the actual default, Applicant (on behalf of the Debtor) and Black Diamond initiated negotiations with respect to the Original DIP Forbearance Agreement which was entered into on January 5, 2007. Applicant evaluated and extensively analyzed the various drafts of the Original DIP Forbearance Agreement and advised the Company with respect to its implications in the context of the chapter 11 proceedings. Applicant also participated in conference calls with Debtor's Board of Directors to inform and advise it with respect to the forbearance negotiations. To aid in the negotiations, the Applicant analyzed the Debtor's historical and projected performance in relation to the forbearance covenants including analysis of the Debtor's borrowing needs. The Applicant also provided a thorough analysis on the Debtor's expected professional fee expenses to negotiate the carve-out associated with the forbearance agreement. Throughout forbearance negotiations, Applicant was also in contact with Debtor's various other creditor constituencies to provide updates with respect to the negotiations.

K.    Alternative DIP financing

51.    Simultaneous to the discussions with Black Diamond regarding the Original DIP Forbearance Agreement, Applicant and the Debtor's other advisors were in frequent communication with the Debtor's various other creditor constituencies to evaluate potential sources of replacement DIP financing. Prior to the Relevant Period, the Debtor received a proposal from Trust Company of the West ("TCW"), as holder of a significant portion of Second Lien faculty, to provide alternative DIP financing to replace the Black Diamond DIP facility. The Debtor also received a proposal from certain pre-petition unsecured creditors with respect to providing a junior term loan in connection with obtaining alternative financing for the senior portion of the DIP, in conjunction with financing from a third party, to replace the Black

Diamond DIP facility. Prior to and during the Relevant Period, Applicant analyzed the terms of the proposed facilities and compared them to the existing Black Diamond facility. Additionally, as both proposals required the Applicant to secure replacement senior DIP financing, Applicant contacted more than ten third-party potential financing sources requesting proposals with respect to a replacement senior DIP facility. Pursuant to this process, Applicant coordinated the due diligence process of the potential third-party providers of a replacement DIP facility and participated in various conference calls with them. Applicant analyzed, evaluated and discussed with management the proposals / responses received in the context of this request.

L.    Second DIP Forbearance Agreement

52.    On January 29th, the Debtor, advised by the Applicant and in conjunction with the DIP Lenders, entered into the Second DIP Forbearance Agreement that provided it with a waiver and forbearance arising from the Debtor's failure to comply with financial covenants of the DIP facility. The Second DIP Forbearance Agreement provided for a carve-out for certain advisors fees and required the Debtor to supply a long-term business plan by January 29, 2007. The Second DIP Forbearance Agreement also required the Debtor to complete a confidential offering memorandum by February 16, 2007 and consummate a sale of the business or have a confirmable plan with the Court by March 20, 2007. The Second DIP Forbearance Agreement also set forth a timeline and objectives for a sale process in the event the Debtor chose to pursue a sale. Applicant participated in and advised throughout the negotiations with Black Diamond with respect to the Second DIP Forbearance Agreement.

M.    Development of 2007 Budget and Business Plan

53.    Applicant participated in the development and review of the Debtor's budget for 2007 (the "2007 Budget") and long term business plan (the "Business Plan"). Additionally, Applicant performed a thorough due diligence review of the 2007 Budget and Business Plan, their underlying assumptions and the Debtor's financial models. During the Relevant Period, Applicant participated in meetings with the Debtor's various creditor constituencies to discuss and provide updates with respect to the development of the Business Plan, the respective underlying assumptions and present the final 2007 Budget and Business Plan presentations. In conjunction with presenting the 2007 Budget and Business Plan, Applicant coordinated follow-up due diligence for the Debtor's creditor constituencies, including scheduling diligence conference calls with management and facilitating access to supporting documents.

N.    Development of Offering Memorandum and Preparation of Exit Strategy Materials

54.    Pursuant to the Second DIP Forbearance Agreement, and in conjunction with delivering the 2007 Budget and Business Plan, Applicant worked closely with management and Debtor's other advisors to construct a detailed offering memorandum for the potential sale of the Debtor. Applicant held numerous meetings with management and performed detailed due diligence of the Debtor's business and industry. On February 8th, Applicant delivered on behalf of the Debtor a draft of the confidential information memorandum to Black Diamond as DIP agent. On February 16th, Applicant on behalf of the Debtor delivered to Black Diamond, as DIP agent, a final draft of the detailed confidential information memorandum.

55.    In addition to the confidential information memorandum, the Second DIP Forbearance Agreement also included a provision that required the Debtor to commence

preparations to exit Chapter 11. Applicant, with the assistance of management and the Debtor's other advisors, worked on preparing various exit strategy materials. Applicant developed a process timeline pursuant to the various possible paths to exit from chapter 11 and reviewed it with management and the other Debtor's advisors. Applicant also identified potential buyers for the assets of the Debtor and prepared a detailed buyers list / contact log for the §363 sale process. Also in connection with the §363 sale process, Applicant developed a teaser and negotiated confidentiality agreements (prepared by Willkie) with potential buyers.

O.      Alternative Plan of Reorganization Development

56.   In conjunction with preparing the aforementioned exit strategy materials, the Applicant developed a preliminary term sheet (the "Term Sheet") to be used in negotiating a plan of reorganization (the "POR"). In developing the Term Sheet, the Applicant held numerous calls with the Debtor's creditor constituencies to discuss terms and generate discussions around the potential for exit through a POR. The Applicant analyzed numerous potential structures with regards to the Term Sheet, including an analysis of current claims, potential exit financing alternatives, potential recoveries and warrant values. The Applicant worked closely with Willkie in analyzing the financial and legal implications of the numerous Term Sheets drafted before entering into further discussions with the Debtor's creditors.

P.      Purchase Offers from Pre-Petition Lenders

57.   On January 18, 2007, the Second Lien Investor Group submitted an unsolicited offer to purchase substantially all of the Debtor's assets for approximately $175.0 million. While the Debtor and Applicant were in negotiations with the Second Lien Investor Group regarding the terms of its proposal, the Debtor also received an unsolicited offer from the First Lien

Investor Group. The Debtor and Applicant completed an analysis of each proposal and held negotiations with both the Second Lien Investor Group and the First Lien Investor Group.

58. Applicant participated in various calls with the First Lien Investor Group as well as with the Second Lien Investor Group to obtain a full understanding of terms and conditions of their respective offers. Applicant advised management and the Board of Directors with respect to the Purchase Offers, their implications in the context of the chapter 11 proceedings and the preparation of press releases associated with the proposals and on February 1, 2007 the Debtor entered into a non-binding term sheet with the First Lien Investor Group regarding the sale of substantially all of the Debtor's assets.

59. On March 22nd, the purchase offer submitted by certain holders of the First Lien facility was approved by the Court as the Stalking Horse bid. Following the approval of the First Lien Investor Group as the Stalking Horse, Applicant, with the Debtor's other advisors, continued to negotiate with the First Lien Investor Group with respect to the outstanding issues and schedules of the asset purchase agreement, including treatment of real estate assets and assumption of liabilities. Applicant also reviewed the terms of the financing commitment supporting the First Lien Investor Group's purchase proposal.

60. Applicant participated in various calls with the First Lien Investor Group as well as institutional lenders and advisors for the First Lien Investor Group with respect to the Sale and financing of the Sale. The Applicant coordinated due diligence for the various interested parties associated with the First Lien Investor Group's proposal including setting up conference calls between management and the interested parties and handling the information flow between all parties.

Q.    Purchase Offers from First Lien and Second Lien lenders

61.   Debtor received an offer from certain holders of the Second Lien facility (the "Second Lien Investor Group") to purchase substantially all of its assets pursuant to a §363 sale process (the "Second Lien Purchase Offer").  During the Relevant Period, Debtor received an offer from certain holders of the First Lien facility (the "First Lien Investor Group") to purchase substantially all of its assets pursuant to a §363 sale process (the "First Lien Purchase Offer"). Subsequent to the receipt of the First Lien Purchase Offer, the Second Lien Investor Group submitted a revised purchase offer (the "Revised Second Lien Purchase Offer").

62.   Applicant participated in various calls with the First Lien Investor Group as well as with the Second Lien Investor Group to obtain a full understanding of terms and conditions of their respective offers.  As part of its evaluation of the Purchase Offers, Applicant performed extensive analysis with respect to their financial implications and implied recoveries to all creditor constituencies and prepared a detailed side-by-side analysis of the terms of the two proposals. Applicant also analyzed various precedent transactions, in particular with respect to break-up fees.  In addition, Applicant evaluated the financing proposals backing each of the Purchase Offers with respect to structure and borrowing base calculations. Applicant advised the Company and the Board of Directors with respect to the Purchase Offers, their implications in the context of the chapter 11 proceedings and the preparation of press releases associated with the proposals.

63.   In conjunction with the receipt of the Purchase Offers, the Debtor and Applicant coordinated extensive due diligence for both the First Lien Investor Group, Second Lien Investor Group and each group's third party lenders and advisors, including the CIT Group, Bank of

America, Crowe Chizek, Hilco and Corporate Revitalization Partners. The Debtor and Applicant participated in numerous meetings and conference calls to ensure the parties' diligence needs and requests were being answered in as timely a manner as possible, including meetings with the Debtor's management in Chicago, IL and Greenville, PA. The Applicant coordinated due diligence performed with respect to the Debtor's operations in Juarez, Mexico. The Applicant also coordinated to have Phase I Environmental Reports performed on the Debtor's real property in Erlanger, KY; Chicago, IL and Juarez, Mexico.

64.   Applicant, with management and other advisors of the Debtor, participated in numerous meetings and calls with the First Lien Investor Group and the Second Lien Investor Group to negotiate improvements to the terms of the Purchase Offers and remove all contingencies from the asset purchase agreements corresponding to each of proposals.

65.   Applicant also performed diligence and analysis surrounding the various liabilities to be assumed under each investor group's proposal. The Applicant held numerous calls with management of the Debtor to fully understand the liabilities and amounts that would be assumed and would remain with the Debtor after the sale of substantially all of the Debtor's assets. The Applicant also held numerous conference calls with the investor groups to negotiate amounts of the assumed liabilities and reasonable baskets for future liabilities during the sale transaction process.

R.   Bidding Procedures

66.   Applicant assisted the Debtor and its other advisors in developing Bidding Procedures favorable to the Debtor but also acceptable to the First Lien and Second Lien Investor Groups. Applicant participated in various calls with the Debtor and its other advisors as well as

with the two investor groups throughout the development and negotiation of the Bidding Procedures. Applicant also performed an analysis of the terms of Bidding Procedures in precedent transactions, in particular with respect to bidder protections including break-up fees and expense reimbursement and testified in support of these matters in Court. During the Relevant Period, the Debtor filed a motion to approve Bidding Procedures.

67. The Debtor, assisted by Willkie and Applicant, filed a motion to approve Bidding Procedures. During the Relevant Period, certain creditor constituencies filed objections to the bidding procedures motion. Applicant reviewed the objections, informed the Board about the objections and assisted Willkie and management in drafting a response to them.

S.    Bid Solicitation Process

68. Beginning in February 2006, Applicant conducted a third-party bid solicitation process with respect to the assets of the Debtor (the "Bid Solicitation Process"), through which Applicant contacted more than 190 potential strategic and financial buyers regarding their interest in acquiring the Debtor's assets. Applicant had numerous conversations with the various potential buyers to market the Debtor's assets and to discuss the sale process. As part of this Bid Solicitation Process, Applicant also distributed a teaser to a number of the identified potential buyers.

69. Applicant distributed and negotiated confidentiality agreements with more than 60 potential buyers who expressed an interest in the process. Applicant also distributed copies of the confidential information memorandum to the 27 potential buyers that executed a confidentiality agreement satisfactory to the Debtor. Applicant maintained a dialogue with those parties who expressed interest regarding the state of the sale process. Applicant also maintained

a detailed contact log with respect to the Bid Solicitation Process. Although numerous parties expressed interest in the Debtor's assets, no third party bids were submitted.

T.      Second Amended DIP Forbearance Agreement

70.    On March 22nd, the Debtor, advised by the Applicant and in conjunction with the approval of the First Lien Investor Group's selection as stalking horse, entered into a Second Amended DIP Forbearance Agreement that provided it with sufficient time and liquidity to complete the sale process. Applicant participated in and advised throughout the negotiations with Black Diamond with respect to the Second Amended DIP Forbearance Agreement.

U.      Settlement Discussions and Consensual Agreement

71.    Following the approval of the First Lien Investor Group as the stalking horse, the First Lien Investor Group, Second Lien Investor Group and members of the OCUC entered into settlement discussions with respect to the ongoing sale process. Applicant and the Debtor's other advisors participated in the settlement discussions and provided the Debtor and the Board of Directors updates with respect to the development of these discussions. In connection with the settlement discussions, Applicant and the Debtor's other advisors recommended the Debtor extend the bid submission deadline and the subsequent auction on two occasions. Prior to the expiration of the bid submission deadline, the parties involved in the settlement discussions (the "Buyer Group") jointly submitted an amendment to the original First Lien Investor Group's proposal. Applicant analyzed the revised proposal in detail, particularly with respect to the improved conditions it offered relative to the original proposal submitted by the First Lien Investor Group. Applicant and the Debtor's other advisors provided a recommendation to the Debtor and the Board of Directors with respect to the revised proposal. The recommendation

was to accept the revised proposal given that (i) it contained improvements with respect to certain terms in the original proposal including the assumption of substantially all of the Debtor's administrative liabilities and the funding of the Wind Down Budget; (ii) it had the support of the three major creditor constituencies in the Debtor's chapter 11 cases and (iii) no third-party bids were submitted prior to the bid submission deadline.

V.    Wind down budget

72.    In conjunction with the §363 sale, Applicant developed with management and the Debtor's other advisors a budget for the wind-down of the Debtor's estate, which was completed and shared with the various creditor constituencies. During the Relevant Period, Applicant led several conference calls with the various creditor constituencies to discuss, negotiate and finalize the wind-down budget.

W.    Potential Sale of Franklin Park Facility

73.    Prior to and during the Relevant Period, Applicant has assisted the Debtor in analyzing the alternatives available with respect to a possible sale of its Franklin Park property. Prior to the Relevant Period, Applicant coordinated the initial phase of a sale process of the Debtor's Franklin Park property in which approximately 34 parties were contacted. Applicant, with the other Debtor's advisors, advised management as to next steps with respect to this process and presented a recommendation to the Board, which consisted of entering into negotiations with the bidder that submitted the proposal with the most favorable terms (the "Preferred Bidder") to try to reach an agreement for such bidder to act as a stalking horse in an auction to be held on a future date. Applicant's negotiations with the Preferred Bidder did not

result in the selection of a stalking horse. The inability of the Preferred Bidder to enter into a binding commitment forced the Applicant to re-start the sale with the interested parties.

74. The Debtor received three bids as part of this process, none of which were unconditional. The Debtor, assisted by Applicant and its other advisors, entered into negotiations with the bidder that submitted the proposal with the most favorable terms. Simultaneously, Applicant has coordinated the preparation of various third-party reports required by the potential buyers as part of their due diligence process, including environmental, geotechnical, civil engineering and asbestos reports. Applicant contacted the third parties preparing the reports, reviewed the reports to ensure that they would satisfy the diligence requirements of the potential buyers and coordinated the dissemination of these reports to the various interested parties.

75. In anticipation of the sale of the Franklin Park property, Applicant commenced preparations to conduct the sale of the machinery and equipment to be disposed following the sale of the Franklin Park facility. Applicant received and evaluated preliminary proposals pursuant to this process. Given the status of the property sale, Applicant did not take any further action in this respect during the Relevant Period but has maintained constant communication with the parties that participated in this process.

76. Applicant assisted management in communicating with the Debtor's various creditor constituencies with respect to the sale process and the response of the potential buyers contacted during the process.

X.    Aluminum and other raw materials

77. Applicant worked closely with management and advisors of the Debtor in developing an aluminum hedging strategy. Applicant prepared and updated on several occasions

an extensive analysis of various hedging alternatives available to the Debtor, evaluating the total potential cost and liquidity impact under various aluminum market prices. Prior to the Relevant Period, Applicant participated in numerous conference calls to discuss the Debtor's hedging strategy, which ultimately led to entering into its hedging position. Applicant assisted management in closely following the aluminum market to evaluate the Debtor's hedging strategy alternatives going forward.

Y.    Response to discovery request

78.    During the relevant period the Applicant was served discovery requests from one of the Debtor's creditors and the OCUC. Applicant was required to produce all requested materials in a relatively short time period. The Applicant's team members worked expeditiously to produce all relevant documents, emails and other electronic files as requested.

Z.    Meetings with Board of Directors and Key Stakeholders

79.    Applicant participated on numerous conference calls with the Debtor's Board of Directors to discuss various business, legal, operational restructuring, employee and Chapter 11 issues. Applicant participated in Board calls and meetings during the Relevant Period on June 13th and 16th, 2006, to discuss first day motions and July 6th, September 9th and September 20th, 2006 to update the Board on the bankruptcy process and business performance. Applicant held Board calls on October 10th, 14th and 18th, 2006 to discuss alternative DIP financing and provide updates on the process and amendments to the Black Diamond DIP. Applicant participated in Board meetings on November 2nd, 15th, 16th and 20th, 2006 to discuss management issues and December 5th and January 5th to review and approve the Business Plan. Applicant participated on Board of Director calls on January 5th with regards to the Original DIP

Forbearance Agreement; January 29th to approve the Second DIP Forbearnace Agreement and to provide an update to the bankruptcy proceedings and potential exit strategy; February 22nd to discuss the Second Amended Forbearance; March 6th to provide an update to the sale process; March 19th to provide an update to the sale process and accept the Black Diamond as stalking horse and April 24th to receive the consent of the Board on the sale transaction of 2007. Applicant also participated in several conference calls with the Debtor's key stakeholders to discuss similar topics.

80.   75.   Applicant respectfully submits that the compensation requested for the Relevant Period for services rendered by Applicant to the Debtor is fully justified and reasonable based on the following: (i) the degree of activity during the Relevant Period and the high level of services rendered by Applicant to the Debtor; (ii) the complexity of the issues presented; (iii) the skill necessary to perform the financial advisory and investment banking services properly; (iv) the preclusion of other employment; (v) customary fees charged in non-bankruptcy situations for similar services rendered; (vi) time constraints required by the exigencies of the case and (vii) the experience, reputation and ability of the professionals rendering services.

## SUMMARY OF EXPENSES INCURRED

81.   During the Relevant Period, Applicant incurred reasonable and necessary out-of-pocket expenses aggregating $513,085.30. Details of the expenses incurred during the Relevant Period are also provided in Exhibit C. Applicant submits that all such expenses were necessarily incurred, are reasonable in amount and represent only the actual costs incurred.

82.   Applicant's charges for expenses to the Debtor are determined in the same manner as for clients in non-bankruptcy matters. Out-of-pocket expenses incurred by Applicant are

charged to a client if the expenses are incurred for the client or are otherwise necessary in connection with services rendered for such particular client. Applicant does not factor general overhead expenses into disbursements charged to clients in connection with Chapter 11 cases. Applicant has followed its general internal policies with respect to out-of-pocket expenses billed to the Debtor as set forth below, with any exceptions fully explained:

(a)    Applicant's general policy permits its employees to bill lunch or dinner meals to a client if the employee is required to provide services to the client during such mealtime due to extreme time constraints. Applicant's employees are permitted to order meals in the office if Applicant's employee is required to work after 8:00 p.m. on weekdays or more than five (5) consecutive hours on weekends or holidays. Meal expenses incurred during meetings which employees and other meeting participants are required to attend are billed at cost;

(b)    Messengers and couriers are used by Applicant to deliver hard copy documents relating to a client matter, which require receipt on an expedited basis; otherwise, Applicant uses the regular postal system. Any charges for either messengers or couriers are billed to the client at cost;

(c)    All airfare and other transportation charges incurred by Applicant's employees directly in connection with services to the client are billed to client at cost;

(d)    The research/database category consists of the cost of using databases (e.g., Disclosure, Securities Data Corporation, Dow Jones, etc.) to which Applicant subscribes to search for and obtain information used in Applicant's financial analyses. Applicant pays the vendor's standard rate for such database services. In

certain instances, Applicant has determined that paying a flat annual or monthly fee for such services is less costly than contracting for such services on a per use basis. Such annual or monthly services are allocated to clients based on such clients' use of each service. The research category also consists of charges from outside services, which supply, for a fee, financial documents from regulatory agencies, which cannot be obtained from databases subscribed to by Applicant;

(e)     Applicant bills photocopying charges at the rate of $.10 per page for black and white copies and $1.00 per page for color copies;

(f)     With respect to local travel, Applicant's general policy enables employees to travel by taxi or, in certain circumstances, by private car service, to and from meetings while rendering services to a client on a client related matter, for which the client is charged. This policy is based on Applicant's determination that travel by taxi or private car service is the most efficient use of a professional's time. Applicant's employees are not permitted to charge personal commuting expenses to a client unless the employee is traveling after 8:00 p.m. and has been required to work late as a result of the time exigencies of that client's matters;

(g)     Telephone expenses are charged based on Applicant's actual cost of telephone charges with respect to client matters. Cellular phone charges are based on vendor's actual invoices; and

(h)     Word processing charges represent actual costs incurred by Applicant's in-house vendor and actual cost of overtime secretarial support in connection with client matters.

83. In the course of rendering services to the Debtor as their financial adviser and investment banker during the Relevant Period, Applicant incurred and paid certain expenses as outlined in Exhibit C. Applicant submits that all such expenses were necessarily incurred, are reasonable in amount and represent only the actual costs incurred by Applicant.

## CONCLUSION

84. The services summarized by this application and rendered by Applicant to the Debtor during the Relevant Period were substantial, highly professional and instrumental to the Debtor's performance in the cases. They were reasonable and necessary to the Debtor's performance of their duties.

85. As noted above, in accordance with the provisions of the Fee Procedures Order and the Retention Order, Applicant seeks final approval of expenses for services rendered in the amount of $3,711,008.20 in Fees plus expenses of $513,085.30 incurred and paid by Applicant during the Relevant Period. As demonstrated throughout this Application, the amount of compensation requested by Applicant is necessary, fair and reasonable.

86. All services for which compensation is sought were performed for and on behalf of the Debtor. Except as permitted under Section 504 of the Bankruptcy Code, Applicant has not entered into any agreement, express or implied, with any party in interest for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.

* * *

81. WHEREFORE, Applicant respectfully requests final allowance of (a) compensation accrued under the Engagement Letter in the amount of $3,711,008.20 during the Relevant Period and as agreed upon in the Stipulation by the Applicant and ordered by the Court and reimbursement of reasonable and necessary expenses incurred by Applicant during the Relevant Period in the amount of $513,085.30 for a total amount of $4,224,093.50 and (b) such other and further relief as this court deems just and proper.

Dated: New York, New York
       November 30, 2007

ROTHSCHILD INC.

By: _____
    Neil Augustine, Managing Director

316736

39

### VERIFICATION

STATE OF NEW YORK     §

                                   §

NEW YORK CITY        §

      NEIL AUGUSTINE, after being duly sworn according to law, deposes and says:

      1.    I am a Managing Director with the applicant firm, Rothschild Inc. ("Rothschild"), which firm maintains offices for providing financial advisory and investment banking services at 1251 Avenue of the Americas, New York, NY 10020. Rothschild has acted as investment banker to and rendered professional services on behalf of the Debtor.

      2.    I have personally performed many of the financial advisory and investment banking services rendered by Rothschild as investment banker to the Debtor and am thoroughly familiar with all other work performed on behalf of the Debtor by the professionals in the firm.

316736

40

3.    I have reviewed the foregoing Application and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I have reviewed the United States Trustee Guidelines For Reviewing Applications For Compensation And Reimbursement Of Expenses Filed Under 11 U.S.C. § 331 (the "Guidelines") and the Application substantially complies with these Guidelines.

4.    In addition, I have reviewed the requirements of Local Rule of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware 2016-2 and certify that this Application substantially complies with that Rule.

Neil Augustine, Managing Director

SWORN AND SUBSCRIBED before me this _30_ day of November 2007.

Notary Public
My Commission Expires:

DONNA GRASSO SHANDLEY
Notary Public, State Of New York
No.01GR6058322
Qualified In Westchester County
Commission Expires May 7, 20 11

316736                                                                                    41